# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ADOLPHE PIERRE-LOUIS,

      Plaintiff,

vs.                                                                              No. CIV 12-0527 JB/RHS

JOSEPH SCHAKE, in his individual capacity
and the STATE OF NEW MEXICO,

      Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on: (i) Defendants Joseph Schake and the State

of New Mexico's Motion for Summary Judgment Based on Qualified Immunity and Supporting

Memorandum of Law, filed October 10, 2012 (Doc. 14)("MSJ"); and (ii) Plaintiff's Cross-

Motion for Summary Judgment, filed December 19, 2012 (Doc. 20)("Cross MSJ").  The Court

held a hearing on April 29, 2013.  The primary issues are: (i) whether Defendant Joseph Schake

had reasonable suspicion to stop Plaintiff Adolphe Pierre-Louis where a man reported to Schake

that a drive of a white Expedition had, moments earlier, threatened him with a gun, and that the

driver was bald and had a black eye, and when Schake stopped Pierre-Louis based on the

similarities he perceived between Pierre-Louis and the alleged assailant, including that Pierre-

Louis was driving a large white Ford SUV, appeared to be bald or have short hair, and was in the

---

[1] On September 30, 2013, the Court issued an Order in which it granted Defendants
Joseph Schake and the State of New Mexico's Motion for Summary Judgment Based on
Qualified Immunity and Supporting Memorandum of Law, filed October 10, 2012 (Doc. 14), and
denied the Plaintiff's Cross-Motion for Summary Judgment, stating: "The Court will . . . at a
later date issue a memorandum opinion more fully detailing its rationale for this decision."
Order at 1 n.1, filed September 30, 2013 (Doc. 27).  This Memorandum Opinion is the promised
opinion.

same proximity as the alleged assailant; and (ii) whether the scope of the detention was reasonably related in scope to the circumstances justifying it, where Schake stopped Pierre-Louis and detained him for about fifteen minutes to verify whether he was the alleged assailant, and, when the victim confirmed that Pierre-Louis was not the assailant, Schake released Pierre-Louis. The Court will grant the MSJ on the federal claim, deny the Cross MSJ, and remand the remaining state claims to state court. The detention was justified at its inception, because Schake had reasonable suspicion to stop Pierre-Louis based on the similarities he perceived between the report and Pierre-Louis, and the detention was reasonably related in scope to the circumstances, because Schake thought Pierre-Louis could be armed and dangerous, and he released Pierre-Louis when the victim confirmed that Pierre-Louis was not the assailant.

## FACTUAL BACKGROUND

On August 17, 2011, Schake was traveling east bound on Interstate 40 near Albuquerque, New Mexico. See Affidavit of Sergeant Joseph ¶ 4, at 1, dated October 2, 2012, filed October 10, 2012 (Doc. 14-1)("Schake Affidavit"); MSJ ¶ 1, at 2 (setting forth this fact); Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ¶ 1, at 2, filed November 26, 2012 (Doc. 16)("Response")(not disputing this fact). Approximately half way between mile markers 145 and 146, Candelario Chavez flagged down Schake by "frantically waving his arms in the air and jumping up and down." Schake Affidavit ¶ 5, at 2. See id. ¶ 7, at 2; MSJ ¶¶ 2, 4, at 2 (setting forth this fact); Response ¶ 2, at 2 (not disputing this fact). Schake activated his emergency red lights and pulled over to the right shoulder of the road. See Schake Affidavit ¶ 6, at 2; MSJ ¶ 3, at 2 (setting forth this fact); Response ¶ 2, at 2 (not disputing this fact).

Chavez told Schake that a man had pulled a gun on him and that it had happened "right now."  Schake Affidavit ¶¶ 7-8, at 2.  See MSJ ¶¶ 4-5, at 2 (setting forth this fact); Response ¶ 2, at 2 (not disputing this fact).  Chavez did not know the man's name, but said he was bald, had a black eye, was driving a white Expedition, and was the only person in the vehicle.  See Schake Affidavit ¶ 11, at 2; Dash Cam Video Transcript at 3:7-19 (Male Voice, Officer), filed November 26, 2012 (Doc. 16-4)("Dash Cam Tr."); MSJ ¶ 7, at 3 (setting forth this fact); Response ¶ 4, at 2 (not disputing this fact); Response ¶ 3, at 4 (setting forth this fact); Reply ¶ 3, at 3 (not disputing this fact).[2]

---

[2]  The Defendants assert that Chavez told Schake that the alleged assailant would be traveling east.  See MSJ ¶ 6, at 3 ("Candelario Chavez stated that the man went east bound in a white Expedition and that the man was the only one in the white Expedition."); Schake Aff. ¶ 10, at 2 ("Candelario Chavez stated that the man would be on Interstate 40 going east bound and that he would be heading for the overpass and heading south.").  Pierre-Louis asserts that "Chavez did not tell Sergeant Schake that the man went 'east bound.'"  Response ¶ 3, at 2 (citing Dash Cam Tr. 3).  The Dash Cam Tr. and the Dash Cam Video, filed November 26, 2012, lodged in Records Department (Doc. 17), show that Chavez did not specifically state whether the alleged assailant would be traveling "east" or "west," but said that the assailant went "on that side.  He went that way, he'll be going that way," Dash Cam Tr. at 2:10-11 (Male Voice), and that "as soon as you can get right there to overpass and turn right, he'll be going all the way that way," Dash Cam Tr. at 3:3-4 (Male Voice), to which Schake responded, "Is he going to be heading south?" Dash Cam Video at 1:43:40-1:43:46 (Schake).  When Schake was reporting to dispatch, he said that the subject proceeded "westbound on I-40," Dash Cam Tr. at 4:1-5 (Officer), and then said something inaudible, followed by "I apologize," followed by more inaudible statements, Dash Cam Video at 1:44:36-1:44:57 (Schake).  In the State of New Mexico Incident Report, filed November 26, 2013 (Doc. 16-2)("Schake Incident Report"), Schake wrote:

> [Chavez] was pointing at the west bound lanes of I-40 and I asked him if the vehicle was on the Interstate heading east bound and he told me 'yes and he tried to shoot me right there on the side'.  He seemed very distraught.  He indicated that the subject would be going to the overpass and heading south.

Schake Incident Report ¶ 2, at 1.  Shake also wrote: "I found multiple cross overs between the east and west bound lanes of I-40 that could have been used for the vehicle to cross back over from the west bound lanes to the east bound lanes."  Schake Incident Report ¶ 5, at 1.
        D.N.M.LR-Civ. 56.1(b) states:

At the time that he flagged Schake down on the side of I-40 and reported that someone had pulled a gun on him, Chavez had numerous tattoos and was carrying heroin syringes in his backpack.  See New Mexico Supplemental Report from Officer Sean Healy at 2, supplemented August 17, 2011, filed November 26, 2012 (Doc. 16-3)("Healy Report"); Response ¶ 1, at 4 (setting forth this fact).[3]  Candelario was "speaking very fast and had a frightened look on his

---

The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56. 1(b).   The local rules regarding summary judgment thus require the responding party to "specifically controvert[]" the movant's fact, or else the fact is deemed admitted.  D.N.M.LR-Civ. 56.1(b).  Because Pierre-Louis has referred the Court to the portion of the record with particularity on which he relies to specifically controvert the fact that Chavez said the man would be traveling east, the Court will deem this fact in dispute and will omit it from the facts.

[3] The Defendants argue that this is not a "material fact," because

the fact that Mr. Chavez was covered in tattoos is not relevant and . . . judging persons based on their appearance would be the ultimate form of discrimination when determining whether to believe that the person was a victim of a crime.  Sgt. Schake did not search Plaintiff and therefore was not aware of any needles, which is not material when making the decision as to whether to believe someone's account of criminal behavior.

Reply ¶ 1, at 2-3.

The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.  Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

face and seemed very distraught."  Schake Affidavit ¶ 12, at 2.  See MSJ ¶ 8, at 3.[4]  During the

course of his initial conversation with Schake, Chavez answered all of the questions that Schake

asked of him.  See Dash Cam Video at 1:43:03-1:44:17, filed November 26, 2012, lodged in

Records Department (Doc. 17); Dash Cam Video Tr. at 2-3; Response ¶ 2, at 4 (setting forth this

fact).[5]  Schake made the decision that, given the contemporaneous nature of the event to the

encounter with Chavez, it would be best to proceed to look for the vehicle.  See Schake Affidavit

---

D.N.M.LR-Civ. 56.1(b).  Contending that a fact is immaterial is not disputing a fact, nor is it
specifically controverting a fact by directing the Court with particularity to the record.  See
D.N.M.LR-Civ. 56.1(b).  In O'Brien v. Mitchell, 883 F. Supp. 2d 1055 (D.N.M.2012)(Browning,
J.), the Court explained that, because the proper course is to determine relevance of facts in the
analysis section, rather than in the factual background section, objecting to an asserted fact as
immaterial in response to an asserted fact effectively deems the fact undisputed.  See 883 F.
Supp. 2d at 1058 n.1.   See Wilson v. Jara, 866 F. Supp. 2d 1270, 1276-79
(D.N.M.2011)(Browning, J.)("Whether this fact is relevant is a legal argument, and the Court
will not address [the cited case] at this time, but will consider it in its legal analysis.").  The
Court thus deems these facts as undisputed and will, as necessary, determine their relevance in
the analysis section.

    [4] Pierre-Louis "disputes" this fact "to the extent that it suggests that Candelario Chavez
was hard to understand or was unable to offer clear answers to Sergeant Schake's questions.  To
the contrary, Candelario Chavez clearly answered all of Sergeant Schake's questions."  Response
¶ 5, at 2 (citing Dash Cam Tr. at 2-3; Dash Cam Video).  The local rules regarding summary
judgment require the responding party to "specifically controvert[]" the movant's fact or else the
fact is deemed admitted.  D.N.M.LR-Civ. 56.1(b).  Pierre-Louis has not specifically controverted
that Chavez was "speaking very fast," "had a frightened look on his face," and "seemed very
distraught," and thus, the Court will find this fact as undisputed.

    [5] The Defendants assert that "[i]t was difficult to get any further information from
Candelario Chavez due to his excited state," MSJ ¶ 9, at 3 (citing Schake Aff. ¶ 13, at 2), but
Pierre-Louis controverts this asserted fact by pointing out that Chavez answered the questions
that Schake asked, see Response ¶ 2, at 4 (citing Dash Cam Tr. at 2-3).  Although the Defendants
contend that whether Chavez answered all of the questions is not a "material fact," and that
"Schake's account of how the information was relayed to him does not go to the issue of
qualified immunity," Reply ¶ 2, at 3, arguing that a fact is not material does not specifically
controvert a fact.  The Court will, as necessary, determine these facts' relevance in the analysis
section.

¶ 14, at 2; MSJ ¶ 10, at 3 (setting forth this fact); Response ¶ 7, at 3 (not disputing this fact).

With the description that the alleged assailant was bald, driving a white Expedition, had a black

eye, and was the sole occupant of the vehicle, and no more information that he could use to

identify the vehicle or its driver, Schake began to pursue the Expedition.  See Dash Cam Tr. at

2:1-4:24 (Officer, Male Voice, Dispatch); Response ¶ 4, at 4 (setting forth this fact); Reply ¶ 3,

at 3 (not disputing this fact).   Schake did not ask Chavez for a description of his alleged

assailant's height and weight, race, clothing, or license plate information.  See Dash Cam Tr. at

2-3; Schake Aff. ¶ 14, at 2; Healy Report at 1; Response ¶ 5, at 4 (setting forth this fact); Reply

¶ 3, at 3 (not disputing this fact).  Schake pursued the alleged assailant on I-40 at speeds in

excess of ninety-five miles per hour.  See Dash Cam Video at 1:45:01-1:45:31; Response ¶ 6, at

5 (setting forth this fact).[6]

Schake located a white Ford Explorer traveling east on I-40; when he pulled up alongside

the vehicle, he saw that the driver was the only occupant in the vehicle, and "appeared to be bald

or had very short hair."  Schake Affidavit ¶ 15, at 2.  See MSJ ¶ 11, at 3.[7]  Schake stopped

Pierre-Louis, because, in his view, "the vehicle appeared to match the description by Candelario

---

[6] The Defendants contend that this fact is not "a material fact," and that the asserted fact "underscore[s] the statement of Sgt. Schake that he believed that the person involved in the assault against Candelario Chavez was armed and that he had a chance of locating the person because it had happened 'right now.'"  Reply ¶ 4, at 3.  Arguing that a fact is not material does not specifically controvert a fact.  The Court will, as necessary, determine this fact's relevance in the analysis section.

[7] Pierre-Louis "disputes" this fact "to the extent that it suggests that Plaintiff appeared 'bald.'"  Response ¶ 8, at 3 (citing Pictures at 5-8, filed November 26, 2012 (Doc. 16-1 at 5); Dash Cam Video).  The pictures, which are taken from the Dash Cam Video after Pierre-Louis was stopped and outside of his vehicle, do not specifically controvert whether Pierre-Louis appeared bald when Schake drove alongside him; thus, the Court will include Schake's statement that Pierre-Louis "appeared to be bald."  Schake Affidavit. ¶ 15, at 2.

Chavez."  Schake Affidavit ¶ 16, at 3.  See MSJ ¶ 12, at 3.[8]  When Schake pulled over Pierre-Louis, Pierre-Louis was driving an Explorer, and not an Expedition.  See Pierre-Louis Affidavit ¶ 6, at 1; Response ¶¶ 8-9, at 5 (setting forth this fact).[9]  Pierre-Louis was not bald and did not have a black eye.  See Pierre-Louis Affidavit ¶¶ 7-8, at 1; Response ¶¶ 10-11, at 5 (setting forth this fact).[10]

---

[8] The Defendants set forth the following fact: "Based on the information Sergeant Schake had and the fact that the vehicle appeared to match the description given by Candelario Chavez, Sergeant Schake made a felony stop."  MSJ ¶ 12, at 3 (citing Schake Affidavit ¶ 16, at 3). Pierre-Louis "disputes" this fact "to the extent that it suggests that a man with hair driving an Explorer, matches the description that Sergeant Schake received -- of a bald man driving an Expedition."  Response ¶ 9, at 3.  Legal conclusions are not appropriate to include as material facts.  See Ruiz v. City of Brush, Civil Action No. 05-cv-00897-EWN-CBS, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute. Legal argument . . . should be reserved for separate portions of the brief.'" (alterations in original)).  The Court will modify the asserted fact to indicate what the Defendants' evidence supports, which is that Schake thought the vehicle matched the description that Chavez gave. Whether Schake had reasonable suspicion or probable cause to stop Pierre-Louis is, however, a legal question, which the Court will discuss in the analysis section.  Further, the Court will modify the asserted fact that Schake conducted a felony stop, because this characterization is also a legal conclusion that the Court should instead discuss in the analysis.

[9] The Defendants contend that this fact is not a "material fact," and that Pierre-Louis' asserted fact "only demonstrate[s] the information that Sgt. Schake had was that the assailant's appearance was similar to the physical characteristics of Plaintiff and the vehicle he was driving."  Reply ¶ 5, at 3.  Arguing that a fact is not material does not specifically controvert a fact.  The Court will, as necessary, determine this fact's relevance in the analysis section.

[10] The Defendants argue that that this fact is not material, because Pierre-Louis' asserted facts "as presented only demonstrate the information that Sgt. Schake had was that the assailant's appearance was similar to the physical characteristics of Plaintiff and the vehicle he was driving."  Reply ¶ 5, at 3.  Arguing that a fact is not material does not specifically controvert a fact.  The Court will, as necessary, determine this fact's relevance in the analysis section.

Schake placed Pierre-Louis in handcuffs and detained him to conduct an investigation. <u>See</u> Schake Affidavit ¶ 17, at 3.  <u>See</u> MSJ ¶ 13, at 4.[11]  Schake explained the reason for the stop. <u>See</u> Schake Affidavit ¶ 18, at 3; MSJ ¶ 14, at 4 (setting forth this fact); Response ¶ 11, at 3 (not disputing this fact).  Pierre-Louis was adamant that he was not the alleged assailant, and Schake explained that, if he was not the assailant, he would be released as soon as that representation was confirmed.  <u>See</u> Schake Affidavit ¶ 18, at 3; MSJ ¶ 14, at 4 (setting forth this fact); Response ¶ 11, at 3 (not disputing this fact).  Schake performed a pat-down search of Pierre-Louis and, with Pierre-Louis' consent, searched Pierre-Louis' vehicle; Schake did not find any firearms. <u>See</u> Schake Affidavit ¶ 19, at 3; MSJ ¶ 15, at 4 (setting forth this fact); Response ¶ 11, at 3 (not disputing this fact).  Schake asked New Mexico State Police Officer Sean Healy to locate Chavez and bring him to the scene to confirm if Pierre-Louis was the person who Chavez had described. <u>See</u> Schake Affidavit ¶ 20, at 3.  <u>See</u> MSJ ¶ 16, at 4 (setting forth this fact); Response ¶ 11, at 3 (not disputing this fact).  When Healy arrived with Chavez, Chavez stated that Pierre-Louis was not the alleged assailant.  <u>See</u> Schake Affidavit ¶ 21, at 3; MSJ ¶ 17, at 4 (setting forth this fact); Response ¶ 11, at 3 (not disputing this fact).   Schake then released Pierre-Louis from the handcuffs and let him leave; Pierre-Louis had been detained for approximately fifteen minutes. <u>See</u> Schake Aff. ¶ 21, at 3; Complaint for Damages ¶ 30, at 4, filed May 16, 2012 (Doc. 1 at

---

[11] Pierre-Louis "does not dispute that he was placed in handcuffs and detained, but disputes the materiality of Sergeant Schake's purported intent."  Response¶ 10, at 3 (citing <u>Crawford-El v. Britton,</u> 523 U.S. 574, 587-88, (1998)(holding that the reasonableness inquiry remains focused on objective reasonableness and should not be transformed into an investigation of the officer's subjective good faith)).  Arguing that a fact is not material does not specifically controvert a fact.  The Court will, as necessary, determine this fact's relevance in the analysis section.

5)("Complaint"); MSJ ¶ 18, at 4 (setting forth this fact); Response ¶ 11, at 3 (not disputing this fact).[12]

　　After Pierre-Louis was released, Schake spoke again with Chavez regarding the incident. See Schake Affidavit ¶ 23, at 3; MSJ ¶ 20, at 5.[13]  By this time, Chavez was less excited and frantic, and provided more details.  See Schake Affidavit ¶ 24, at 3.  See MSJ ¶ 21, at 5.[14] Chavez informed Schake that the man was Hispanic; was wearing black basketball shorts, a white short-sleeve shirt, and white shoes; had stubbly hair; weighed approximately 190 pounds; was medium build; and was five foot eleven inches.  See Schake Affidavit ¶ 25, at 3-4; MSJ

---

[12] The Defendants include as a fact that the "Plaintiff was not placed under arrest by Sergeant Schake."  MSJ ¶ 19, at 4 (citing Schake Aff. ¶ 22, at 3).  Pierre-Louis "disputes the legal conclusion contained in ¶ 19 that he was not 'arrested' when he was handcuffed and detained, as well as the implication that Sergeant Schake's intent controls whether or not the detention constituted an arrest."  Response ¶ 12, at 3 (citing Cortez v. McCauley, 478 F.3d 1108, 1115-16 (10th Cir. 2007)("The use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." (internal citations and quotation marks omitted))).  The Court will modify the asserted fact to exclude the legal conclusion that Pierre-Louis was not arrested and will address this argument in the analysis section.

[13] The Defendants included as a fact that, "[a]fter the investigative stop was completed, Sergeant Schake was then able to speak with Candelario Chavez more thoroughly regarding the incident."  MSJ ¶ 20, at 5.  Pierre-Louis "disputes ¶ 20 to the extent that it suggests that Sergeant Schake was unable to speak with Candelario Chavez 'thoroughly' prior to conducting the felony stop of Plaintiff."  Response ¶ 13, at 4 (citing Dash Cam Tr. at 2-3; Dash Cam Video).  The Court will modify this fact to exclude the legal conclusion that the stop was an investigative stop and will exclude the word "thoroughly," because Pierre-Louis established that Chavez answered the questions that Schake asked during their initial interaction.

[14] The Defendants included as a fact that "Chavez was less excited and frantic and was able to provide more details," MSJ ¶ 21, at 5, but Pierre-Louis "disputes ¶ 21 to the extent that it suggests that Candelario Chavez was unable to provide 'more details' before Sergeant Schake decided to conduct the felony stop of Plaintiff," Response ¶ 14, at 4.  The Court will modify this fact to reflect that Chavez provided more details during the second interaction with Schake, but exclude the Defendants' assertion that he was unable to provide more details during the first interaction, because Pierre-Louis established that Chavez answered all of the questions Schake asked during the first interaction.

¶ 22, at 5; Response at 4 (not disputing this fact).  Chavez' additional description of his alleged assailant further conflicted with Pierre-Louis' appearance.  See Schake Aff. ¶ 26, at 4; Pictures at 5-8, filed November 26, 2012 (Doc. 16-1 at 5); Response ¶ 13, at 5 (setting forth this fact).[15]

Although neither party set forth the following facts, or provided evidence to support these facts, the Court learned these facts through the parties' arguments and includes them as background, but does not include them as undisputed material facts: (i) when Pierre-Louis exited his vehicle, he was wearing "Albuquerque Journal press credentials around his neck," Response at 12; and (ii) Pierre-Louis "suffered a torn rotator cuff as a result of the handcuffing," Transcript of Hearing at 27:19-20 (Fine), taken April 29, 2013 ("Tr.").[16]

## PROCEDURAL BACKGROUND

Pierre-Louis brings this action under 42 U.S.C. § 1983 and other state law causes of action.  Pierre-Louis alleges multiple claims against Schake in his Complaint for Damages, filed May 16, 2012 (Doc. 1 at 5)("Complaint"), including (i) illegal arrest under the Fourth and Fourteenth Amendments to the Constitution of the United States (Count I); (ii) illegal arrest under Article II, Section 10 to the Constitution of the State of New Mexico (Count II); and (iii) negligence (Count III).  See Complaint ¶¶ 36-54, at 5-7.  Pierre-Louis also alleges that

---

[15] The Defendants "dispute" that this is a "material fact," and argue that "the facts as presented incorrectly imply that Sgt. Schake had this information prior to stopping Plaintiff." Reply ¶ 6, at 4.  Arguing that a fact is not material does not specifically controvert a fact.  The Court will, as necessary, determine this fact's relevance in the analysis section.  Further, the Court organized the factual section to reflect the order of events that the record supports; as organized, the Court thinks it is clear that Schake did not have the additional information from Chavez until after Schake stopped Pierre-Louis.

[16] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Defendant State of New Mexico, as Schake's employer, is liable under a respondeat superior theory (Count IV).  See Complaint ¶¶ 55-58, at 7-8.  Pierre-Louis filed the case in state court, and the Defendants removed the case to federal court.  See Notice of Removal to the United States District Court for the District of New Mexico, filed May 16, 2012 (Doc. 1).

The Defendants move the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, for summary judgment.  The Defendants assert that Schake is entitled to summary judgment on Pierre-Louis' claims for Fourth Amendment violations.  See MSJ at 10.  They contend that Schake conducted an investigative stop, which does not require probable cause.  See MSJ at 10.  They assert that a "police officer may detain a person for investigative purposes if he/she believes that criminal activity is occurring" and that, "[w]hen the stop is based on reasonable suspicion that criminal activity has occurred, the officer may detain the person 'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'"  MSJ at 10 (quoting Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000)).  The Defendants maintain that Schake did not place Pierre-Louis under arrest, but that Schake detained Pierre-Louis "only for the time that was necessary to confirm that he was not the individual involved in the alleged criminal act against Mr. Chavez."  MSJ at 10, 11.  The Defendants contend that "the exigency of the circumstances and the fact that there was a possibility that an armed gunman was on the loose and had just threatened an individual" justified Schake's actions in stopping Pierre-Louis, based on the description that Chavez gave to Schake: "The vehicle driven by Plaintiff was a white Explorer which is a Ford SUV similar to the Expedition.  Furthermore, the Plaintiff's physical description closely matched the details given by Candelario Chavez and Plaintiff was the only person in the vehicle, which was

consistent with Candelario Chavez' description." MSJ at 10-11.  Although Schake learned more details about the individual who threatened Chavez after Schake stopped Pierre-Louis, he did not have information about the individual's nationality, height, or what he was wearing until after he stopped Pierre-Louis.  See MSJ at 11.  The Defendants contend that "the facts that Sergeant Schake had initially were sufficient to make an investigative stop," that "[t]he stop was conducted within a reasonable period of time," and that Pierre-Louis "was only detained for the time that it took for Mr. Chavez to confirm whether Plaintiff was the person who pulled the gun on him."  MSJ at 11.  The Defendants emphasize that "there are no allegations that Sergeant Schake acted in or displayed any type of unprofessional manner during the stop."  MSJ at 11.

The Defendants argue that Schake, as a New Mexico police officer, is entitled to qualified immunity, because he was "acting under the authority granted to him by the State of New Mexico," his actions were "objectively reasonable . . . in investigating an aggravated assault that occurred 'right now,'" and he "performed his duty reasonably by investigating these allegations and making the felony stop of Plaintiff."  MSJ at 11-12.  The Defendants maintain that Schake's actions were reasonable, because he "believed that an aggravated assault may have just taken place and that an armed gunman was on the loose," and the information he had corresponded with what he observed to be true about Pierre-Louis, justifying the stop until he could confirm from Chavez that Pierre-Louis was not the offender.  MSJ at 12.  According to the Defendants, Pierre-Louis "is simply unable to show that the actions by Sergeant Schake violated any clearly defined right during the detention allowed under the Fourth Amendment."  MSJ at 12.

Pierre-Louis responds that Chavez' description of his assailant was too dissimilar to

Pierre-Louis to support reasonable suspicion for Shake to stop him:

> [T]he Fourth Amendment's reasonableness standard does not countenance police officers conducting high speed chases or gunpoint seizures of American citizens based upon such approximations.  Under a Fourth Amendment reasonableness analysis, the possibility that Sergeant Schake perceived Plaintiff as closely resembling the individual that had been described to him cannot outweigh the reality that Plaintiff was not bald and was not driving an Expedition.

Response at 1-2.  Pierre-Louis disagrees with the Defendants' contention that his seizure was an investigatory stop and not an arrest; he "maintains that he was arrested when he was seized at gunpoint and handcuffed," but asserts that "the distinction between 'arrest' and 'investigatory stop'" does not advance either argument, because the MSJ "hinges on the reasonableness of Sergeant Schake's conduct and not on the nomenclature used to label that conduct."  Response at 6 n.2.  Pierre-Louis argues that "[a] seizure violates the Fourth Amendment if it is objectively unreasonable," that is, "'would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?'"   Response at 6 (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968))(internal quotation marks omitted).  Pierre-Louis contends that the seizure "was not justified at its inception because [Schake] lacked any legal justification -- much less objectively reasonable articulable suspicion -- to believe that Plaintiff had committed a crime."  Response at 7.  Pierre-Louis points to three reasons why Schake's decision to pull him over was unreasonable: (i) it was based on "Chavez' account of his victimization, which was not reliable"; (ii) it was based on "Chavez' description of his alleged assailant, which was not sufficiently detailed to give rise to any objectively reasonable articulable suspicion that Plaintiff had committed a crime"; and (iii) Pierre-Louis did not match "Chavez' sparse description of the alleged assailant."  Response at 7.

Pierre-Louis argues that "[a]n objectively reasonable seizure cannot be based on unreliable information."  Response at 8 (citing <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1116 (10th Cir. 2007)(holding that an arrest that was not based on "reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime" violated the Fourth Amendment")).

> In his brief interaction with Sergeant Schake, Candelario Chavez offered three differing accounts of his alleged assault (the assailant "pulled out a gun" [Dash Cam Tr. at 2:14-15 (Male Voice)], "tried to shoot" Mr. Chavez [Dash Cam Tr. at 2:20-21 (Male Voice)] or "said he had a piece" [Dash Cam Tr. at 2:23-24 (Male Voice)]), and indicated that the alleged assailant was traveling West [State of New Mexico Incident Report ¶¶ 2, 5, at 1, filed November 26, 2013 (Doc. 16-2)("Schake Incident Report")], but would be heading East [Schake Aff. ¶ 9, at 2] and South [Schake Aff. ¶ 10, at 2].  Candelario Chavez did not know the name of his alleged assailant [Schake Aff. ¶ 11, at 2], even though he had been "riding with him" prior to the purported assault [Dash Cam Tr. at 3:14-15 (Officer, Male Voice)].  Sergeant Schake did not ask Candelario Chavez for his name or run a background check on him prior to beginning his hot pursuit nor did he receive an[y] corroboration that the alleged assault had actually occurred.  Because the internal inconsistencies and facial dubiousness of Mr. Chavez' report rendered it unreliable and untrustworthy, Sergeant Schake's exclusive reliance on the report as a basis for conducting a high speed chase and gunpoint seizure was objectively unreasonable.

Response at 8.   Pierre-Louis points out that, when Schake initiated his search, the only information he had available "was that the suspect was bald with a black eye, driving a white Expedition without any other occupants"; he argues that "Schake's failure to gain additional information from Candelario Chavez before rushing into this pursuit was itself objectively unreasonable," calling it "careless police work."   Response at 8-9 (citing <u>United States v. Valenzuela</u>, 365 F.3d 892 (10th Cir. 2004)).  Pierre-Louis argues that the Dash Cam Video does not support Schake's assertion that it was "difficult for him to glean information from Candelario Chavez," and that, had Schake

spent an additional thirty to sixty seconds with Candelario Chavez, he could have
easily discerned the additional information that Mr. Chavez freely provided when
he arrived at the scene of Plaintiff's roadside seizure fifteen minutes after the
initial report, namely that in addition to driving a vehicle other than the one
described, and having hair, Plaintiff also bore a different race, build, and
wardrobe than Mr. Chavez.

Response at 9-10.   Pierre-Louis maintains that "[a] more deliberative response to Candelario

Chavez' report would have also given Sergeant Schake an opportunity to reflect before engaging

motorists at gunpoint."   Response at 10 n.3 (citing Malley v. Briggs, 475 U.S. 335, 343-44

(1986).   Pierre-Louis further contends that "it was objectively unreasonable for Sergeant Schake

to equate, without any articulable grounds for doing so, 'Expedition' with 'Explorer' and 'bald'

with 'short hair.'"   Response at 11.

Alternatively, Pierre-Louis argues that the force Schake used to seize him "was not

reasonably related in scope to the circumstances underlying the seizure."   Response at 11.   He

argues that, even if the seizure "was justified at its inception, it became unreasonable in its scope

when Sergeant Schake handcuffed him."   Response at 11.   According to Pierre-Louis, "'the use

of force such as handcuffs and firearms is a far greater level of intrusion [than an investigative

detention], and requires the government to demonstrate that the facts available to the officer

would warrant a man of reasonable caution in the belief that the action taken was appropriate.'"

Response at 11 (alteration in original)(quoting United States v. Melendez-Garcia, 28 F.3d 1046,

1052 (10th Cir. 1994)).   Pierre-Louis takes issue with the discrepancies between how Chavez

described his assailant and what Schake could see was true about him when he stepped out of his

vehicle:

[Schake] had pulled over a vehicle that did not match the description that
Candelario Chavez had given, and when he drove up along side that vehicle and
then ordered its occupant to exit the vehicle with his hands up, he could see more

> clearly that Mr. Pierre-Louis was not bald, and did not have a black eye, as
> Candelario Chavez had described.  Moreover, prior to handcuffing Mr. Pierre-
> Louis, Sergeant Schake knew that the detainee had been compliant with all
> instructions, had not attempted to flee, was unarmed, and that he wore
> Albuquerque Journal press credentials around his neck.  These circumstances,
> when viewed in their totality, did not warrant a reasonable belief that the greater
> level of intrusion occasioned by handcuffs was needed.

Response at 12.

Pierre-Louis argues that Schake violated clearly established law: "in cases where a defendant is seeking qualified immunity from liability from an allegedly unconstitutional seizure or arrest, the Supreme Court's reasonableness standard, as set forth in Terry [v. Ohio, 392 U.S. 1 (1968)], offers sufficient delineation of clearly established law."  Response at 12 (citing Fuerschbach v. Southwest Airlines, Co., 439 F.3d 1197, 1205-06 (10th Cir. 2006); Jones v. Hunt, 410 F.3d 1221, 1230 (10th Cir. 2005); Mick v. Brewer, 76 F.3d 1127, 1135-36 (10th Cir. 1996))).

> In this case, as in Fuerschbach, the parameters of reasonableness were made
> sufficiently clear to Sergeant Schake by the time-worn principles and tests
> articulated [in] Terry, that he knew or should have known at the time [he] seized
> Plaintiff at gunpoint, that his decision to do so was objectively unreasonable and
> would not withstand constitutional scrutiny.  Alternatively, the obvious
> unreasonableness of pointing a gun and handcuffing Mr. Pierre-Louis, who did
> not match the incomplete description of a perpetrator of a dubious crime, clearly
> established Sergeant Schake's constitutional violation at the time he committed it.
> Brosseau v. Haugen, 543 U.S. 194 (2004).

Response at 14.

The Defendants reply that Schake's actions were objectively reasonable, and that "'the reasonableness of a police officer's actions is evaluated from the perspective of a reasonable officer on the scene, recognizing the police officer may have been forced to make split-second decisions in a stressful, dynamic, and dangerous environment,'" Reply at 4 (quoting Lundstrom

v. Romero, 616 F.3d 1108, 120 (10th Cir. 2010), and that Schake "could reasonably conclude" from the information Chavez provided that "there was an armed assailant that had just assaulted one individual and, if not apprehended, could harm someone else," Reply at 4-5.   The Defendants contend that Lundstrom v. Romero sets forth a two-step inquiry to determine if an investigative detention is reasonable: (i) whether the detention is justified at its inception, based on an officer's objectively reasonable articulable suspicion and the totality of the circumstances; and (ii) whether the officer's actions were reasonably related in scope to the circumstances.   See Reply at 5 (citing Lundstrom v. Romero, 616 F.3d at 1120, 1123).   As to the first step, the Defendants argue that Schake had objectively reasonable suspicion to suspect Pierre-Louis as Chavez' alleged assailant, because Schake had to make a quick decision based on Chavez' report "to look for an assailant who was armed and, according to the facts known by Sgt. Schake, was violent."  Reply at 5.  The Defendants contend that the situation is distinguishable from United States v. Valenzuela, the case upon which Pierre-Louis relies to allege that Schake was careless in his work, because the arresting officer in that case followed a vehicle for several miles before making a stop, did not confirm or do any investigation before stopping the vehicle, and relied only on his own observations.  See Reply at 6.  The Defendants argue that, in this case, "Schake was flagged down, he conducted an investigation on an obviously distraught victim and work[ed] with diligence in attempting to apprehend the alleged assailant."  Reply at 6.  They argue that the situation presented exigent circumstances, because "other individuals could have been possibly harmed."  Reply at 6.

For the second inquiry -- whether Schake's actions were reasonably related in scope to the circumstances -- the Defendants contend that Schake's actions after he stopped Pierre-Louis

were "'reasonably necessary to protect his safety and to maintain the status quo during a detention,'" because Schake "conducted the stop with both his safety and safety of the public in mind."  Reply at 7 (quoting <u>Lundstrom v. Romero</u>, 616 F.3d at 1120).  The Defendants maintain that,

> [a]ccording to the knowledge that Sgt. Schake possessed, Plaintiff was armed and had just committed an aggravated assault.  Once Sgt. Schake made the stop he proceeded quickly to make sure that if Plaintiff was the alleged assailant that he could not access any weapons and injure or kill Sgt. Schake.  Additionally, he sought and was granted permission to search for any weapons.  Throughout this investigation Sgt. Schake explained the reason [f]or the stop and the actions that were being taken.  Sgt. Schake also acted quickly in requesting that another officer, Officer Healy, locate Candelario Chavez, who Sgt. Schake had asked to remain at the initial scene, and bring him to the site where Plaintiff was located.  Once Candelario Chavez arrived and confirmed that Plaintiff was not the alleged assailant, Plaintiff was released.

Reply at 7.  The Defendants also assert that "Schake did not violate any clearly established right at the time that Plaintiff was stopped" and that <u>Fuerschbach v. Southwest Airlines, Co.</u> does not speak to this case, because the officers in that case arrested the plaintiff as a prank, and, thus, the arrest lacked any legal basis.  Reply at 7-8.  The Defendants contend that Schake had reasonable suspicion to stop Pierre-Louis, and that Schake's actions were made "in good faith and in an objectively reasonable manner."  Reply at 8.

In the Plaintiff's Cross-Motion for Summary Judgment, filed December 19, 2012 (Doc. 20)("Cross MSJ"), Pierre-Louis also moves for summary judgment and incorporates the facts and arguments he makes in the Response.  <u>See</u> Cross MSJ at 1.  Pierre-Louis further relies on <u>Romero v. Story</u>, 672 F.3d 880 (10th Cir. 2012):

> In <u>Romero</u>, the plaintiff brought Fourth Amendment claims against Las Cruces police officers who had arrested him after a witness reported that he had heard a loud noise from the parking lot of his apartment.  672 F.3d at 883.  When the witness went outside in response to the noise, he noticed that his car had been

> vandalized and that there was a Hispanic male in the lot.  Id.  The witness also
> reported to law enforcement that the same individual that he had seen in the
> parking lot had gone into plaintiff's apartment.  Id.  The plaintiff, a Hispanic male,
> opened the door after the officers knocked, but soon turned his back on the
> officers and attempted to return inside.  At this point, the plaintiff was tackled,
> handcuffed, and formally arrested.  Id.

Cross MSJ at 2.  The district court in Romero v. Story denied the defendants' motion for

summary judgment.  See Cross MSJ at 2 (citing Romero v. Story, 672 F.3d at 884).  The Tenth

Circuit explained that the plaintiff's "'temporal and geographic proximity to the crime alone is

not sufficient . . . to provide Defendants with reasonable suspicion," acknowledged that

"geographic proximity could, when combined with other factors, contribute to the formulation of

reasonable suspicion," but said that, in that case, "'a person of a particular race standing in a

parking lot where a crime occurred is not enough to create reasonable suspicion.'"  Cross MSJ at

2-3 (quoting 672 F.3d at 888).  Likewise, Pierre-Louis asserts that his proximity to the alleged

crime cannot support reasonable suspicion:

> Mr. Pierre-Louis' brief and unfortunate proximately to the scene of the alleged
> assault (along with thousands of other motorists on Interstate 40 within the same
> time frame) is the only piece of information that ostensibly linked him to
> Candelario Chavez' hazy and unreliable report.   The other descriptors that
> Mr. Chavez used to describe his assailant (bald, black eye, driving an Expedition)
> excluded Plaintiff, who was driving an Explorer, was not bald, and bore no black
> eye.   Because in this case, as in Romero, it was only Mr. Pierre-Louis'
> geographical proximity to the alleged crime scene that supported Sergeant
> Schake's suspicion of him, his seizure was unreasonable at inception and in
> scope.

Cross MSJ at 3 (footnote omitted).  Further, Pierre-Louis contends that, even if the Court

substitutes the vehicle that Chavez described -- a white Expedition -- with the more general

description of a "white large Ford SUV," summary judgment would still be proper, because the

latter description is "far too nonspecific to give rise to reasonable doubt or probable cause."

Cross MJS at 3 n.1 (citing <u>United States v. Jones</u>, 998 F.2d 883, 884-85 (10th Cir. 1993)).

Pierre-Louis argues that <u>Romero v. Story</u> supports his argument "that the unconstitutionality of

Sergeant Schake's seizure of Plaintiff was clearly established at the time that it occurred,"

because the Tenth Circuit found as clearly established law in <u>Romero v. Story</u> that the officers

could not arrest the plaintiff "based solely on his geographical proximity to the crime scene."

Cross MSJ at 3-4.

The Defendants repeat their arguments from the MSJ and Reply, and respond to Pierre-

Louis' reliance on <u>Romero v. Story</u>.  <u>See</u> Response to Plaintiff's Cross Motion for Summary

Judgment, filed January 4, 2013 (Doc. 23)("Cross MSJ Response").  They acknowledge that the

Tenth Circuit in <u>Romero v. Story</u> states that a suspect's temporal and geographic proximity alone

is not sufficient to provide reasonable suspicion, but argue that Schake "had far more facts other

than Plaintiff's geographic location to establish reasonable suspicion."  Cross MSJ Response at

2-3.

> As set forth in Defendants['] Motion for Summary Judgment Sergeant Schake had
> an eyewitness to the account, Candelario Chavez, a description of a man that
> closely matched the Plaintiff, and a similar vehicle description (white large Ford
> SUV).  Sergeant Schake also had the understanding that the alleged offender was
> armed and dangerous based on the account given to him by Candelario Chavez.
> This differs from Plaintiff's assertion that ultimately Sergeant Schake only had
> the description of a "sole occupant of a large white Ford SUV."

Cross MSJ at 3 (quoting Cross MSJ at 3 n.1).  The Defendants maintain that Schake responded

quickly to locate the vehicle that Chavez described; when he observed Pierre-Louis' vehicle, "he

had sufficient reasonable suspicion at that point to make a stop"; Schake's conduct was

reasonable to determine if Pierre-Louis had any weapons; Schake released Pierre-Louis when

another officer brought Chavez to confirm if Pierre-Louis was the assailant; and the entire

process took about fifteen minutes.  Cross MSJ Response at 3.  Finally, the Defendants contend that Schake did not violate clearly established law, because he had "sufficient reasonable suspicion" to stop Pierre-Louis and investigate.  Cross MSJ Response at 4.

At the hearing, the Defendants reiterated that they believe Schake is entitled to qualified immunity, because his actions were "reasonable and specifically targeted into making sure that he fully investigated the situation that he had been apprised of by Mr. Candelario Chavez."  Tr. at 2:22-3:2 (Cheves).  The Defendants described the facts of the case and noted, in response to the Court's question about the traffic on the Interstate that day, that the record they cited did not indicate the amount of traffic.  See Tr. at 3:14-24 (Court, Cheves).  The Defendants emphasized that the events took place within fifteen minutes, and that, throughout Schake's interaction with Pierre-Louis, he tried to explain why he made the stop and why it was important to investigate the situation.  See Tr. at 4:10-20 (Cheves).  The Court said that it seemed "that the pat-down came rather late" and asked why, "if the focus was on the gun," Schake did not pat-down Pierre-Louis for weapons earlier in their interaction.  Tr. at 5:1-5 (Court).  The Defendants asserted that, although the pat-down did not occur immediately when Pierre-Louis stepped out of his vehicle, Lundstrom v. Romero allows an officer to make split-second decisions in stressful situations, and pointed out that Schake conducted the pat-down within fifteen minutes and that it was a stressful environment, because the men were on the side of the Interstate with vehicles driving past.  See Tr. at 5:6-18 (Cheves).  The Defendants said that Schake tried to address Pierre-Louis' concerns during the fifteen-minute interaction; responding to the Court's question regarding how long the interaction should have lasted, even if it was justified at first, the Defendants maintained that Schake detained Pierre-Louis for the period of time needed to allow Healy to pick up Chavez, to

bring him to the scene, and to confirm that Pierre-Louis was not the assailant, which was a reasonable amount of time.  See Tr. at 6:1-7:7 (Cheves, Court).  The Defendants distinguished Romero v. Story, arguing that, in that case, the officer had only "the report of a Hispanic male within the parking lot where a crime had been committed," and the only evidence that could have supported reasonable suspicion was "the race of the individual in the proximity," whereas, in this case, the Defendants contend that Schake had more evidence to support the stop.  Tr. at 7:8-25 (Cheves).  The Defendants pointed out that, had Pierre-Louis been Chavez' assailant, and had Schake let him leave without having Chavez identify Pierre-Louis, "he would have been armed and dangerous and we could have been here for a whole other reason as far as the police not doing their job."  Tr. at 7:25-8:4 (Cheves).  In the Defendants' view, Schake is entitled to qualified immunity, because stopping Pierre-Louis for fifteen minutes to investigate was reasonable; they argue that the Court should grant the MSJ, and dismiss the claims against Schake and the State of New Mexico, because the Complaint does not specify that the State of New Mexico is responsible for anything apart from Schake's actions.  See Tr. at 8:5-25 (Cheves, Court).  The Court asked why Schake should be allowed to stop a white Explorer, when Chavez said his assailant drove a white Expedition, because "[t]hose are different size vehicles."  Tr. at 9:7-12 (Court, Cheves).  The Defendants argued that they are both "large vehicles[,] large SUV's," that Chavez appeared frightened and spoke quickly, and that other descriptors gave Schake reasonable suspicion to stop Pierre-Louis: Chavez said that his assailant was the only one in the vehicle, and Pierre-Louis was driving alone; Chavez said that his assailant was bald, and Pierre-Louis appeared to be bald or have very short cropped hair; and Chavez said that the assault had happened "just now," and Schake spotted Pierre-Louis after he began his search for

- 22 -

Chavez' assailant.  Tr. at 9:13-10:16 (Cheves).  According to the Defendants,

> [o]ne of the big things . . . to underscore here is that [Chavez] said that the person
> inside of the white vehicle had pulled a gun on him, and then as Officer Schake
> understood it[,] he was armed and dangerous . . . and so, therefore, Your Honor,
> when he pulled up and saw the descriptors of the driver, the vehicle, which was
> also a large SUV, knowing that it's possible that large SUV's can be mistaken in
> terms of Expedition or Explorer, he subsequent[ly] . . . made the stop and then
> attempted to fully investigate that stop as expeditiously as he could.

Tr. at 10:17-11:1 (Cheves).  The Defendants said that, after Schake released Pierre-Louis,

"because of the time that had elapsed and the fact that there didn't appear to be any more leads,

there was no other arrests that were made and no further attempt[s] to locate" Chavez' assailant.

Tr. at 11:2-11 (Court, Cheves).  The Court said it was struck by the "poverty of information" that

Schake got from Chavez at first, compared with the amount of information which Chavez

provided during the second conversation; the Defendants agreed that Schake received more

information during the second conversation, but emphasized that, during the first conversation,

"what Officer Schake understood was that an[ ] aggravated assault had just occurred and that he

was dealing with a person who was very frightened and spoke fast."  Tr. at 11:12-25 (Court,

Cheves).  The Defendants clarified that Schake found Chavez on the right hand side of the

eastbound lane on I-40, that Chavez told Shake that his assailant was continuing east, but that the

assailant "might have been . . . going over the overpass and maybe coming back around going

west."  Tr. at 13:5-21 (Court, Cheves).  The Defendants said that Pierre-Louis was driving

eastbound when Schake stopped him.  See Tr. at 13:24-14:3 (Court, Cheves).  The Defendants

emphasized that, after Schake spoke with Chavez the first time, Schake believed that an

aggravated assault had just occurred, and he wanted to "apprehend the suspect as quickly as

possible."  Tr. at 14:4-20 (Cheves).

- 23 -

The Court asked Pierre-Louis whether he would have had a case if Schake had stopped him, "walked up to his vehicle, looked in the car, and then said, 'You're not the guy we're looking for,' and sent him on."  Tr. at 14:24-15:2 (Court).  Pierre-Louis noted that, in the Court's hypothetical, he would not have had any damages, but maintained that Schake did not have reasonable suspicion to stop him, because "the identifiers that were given in this case did not match the vehicle and the person who were pulled over."  Tr. at 15:4-16:16 (Fine, Court).  The Court asked how closely the description must match before a police officer can stop someone and questioned whether, "in the heat of a moment somebody says an[ ] Expedition rather than an Explorer and [the officer] only sees an Explorer, can we really fault the officer for only stopping what he sees?"  Tr. at 16:17-23 (Court).  Pierre-Louis answered that a police officer should have to match the description closely, because

> [i]f an officer who receives information like this and decides that he wants to embark on auto high-speed chase of vehicles that are close to what he thinks are the vehicles that are close to what he thinks are the vehicles that were described by the reporting party, then it's -- then that's a very dangerous situation.

Tr. at 17:3-7 (Fine).  The Court noted that it had seen a case where the police officers were looking for a white Escalade and stopped thirty-six white Escalades before they found the correct one; Pierre-Louis said that, even in that situation, the police officers stopped only white Escalades, and argued, "if the person who was giving the[] information gives specific information, then that should absolutely confine the search."  Tr. at 17:24-18:13 (Court, Fine).  The Court asked: "You think that once [Chavez] uttered the words 'white Expedition,' that . . . even if [Schake] couldn't see a white Expedition he had to only stop white Expeditions?"  Tr. at 18:16-19 (Court).  Pierre-Louis answered affirmatively, because, in his view, "the standard for having particularized suspicion" demanded that Schake stop only white Expeditions.  Tr. at

- 24 -

18:20-22 (Fine).   Pierre-Louis also pointed out that Chavez said his assailant was bald, but Pierre-Louis had short hair, and that Schake should have gotten more information from Chavez to identify the alleged assailant before starting to search, see Tr. at 19:10-20:4 (Fine), such as the assailant's race, height, and weight, see Tr. at 21:5-6 (Fine).   Although Schake said that Chavez was "speaking quickly," "anxious," and in an "excited state," Pierre-Louis argued that "Schake can't have it both ways.   You're getting questionable information from a source of questionable reliability."   Tr. at 20:4-10 (Fine).   Pierre-Louis contended that, "when Mr. Chavez appeared on the side of the road . . . [,] his face is covered in tattoos [and] he was later arrested for having heroin needles in his backpack," and that Schake did not get enough information from Chavez to support stopping Pierre-Louis with his weapons pulled.   Tr. at 20:11-18 (Fine).   Pierre-Louis said that Chavez' tip was unreliable and "woefully incomplete," making the stop unreasonable at its inception.   Tr. at 20:22-24 (Fine).   Further, Pierre-Louis complained that, not only was there a "failure to investigate," but there was a "lack of correspondence between the description that's given and the individual who Officer Schake [pulls] over at gun point.   Mr. Pierre-Louis was not bald he was not driving a white Expedition, he did not have a black eye."   Tr. at 21:8-12 (Fine). Pierre-Louis admitted that he was the sole occupant of the vehicle, but contended that this fact was the only one that matched Chavez' description; he argued that, although he was driving a white SUV, Schake could not substitute Chavez' specific description of a white Expedition for the more general description of a large white SUV.   See Tr. at 22:9-23:7 (Fine, Court).   Pierre-Louis directed the Court to United States v. Jones to support his argument that Schake did not have reasonable suspicion to stop him.   See Tr. at 23:8-15 (Fine).   Pierre-Louis explained that, in United States v. Jones, the Tenth Circuit determined that the police officers acted on an

insufficient tip; in his view, the Tenth Circuit did "a good job of analyzing the [i]nterplay between the weakness [of] the initial description and the decision to pull [someone] over" when the description of the person that the police pulled over matched the description given, but the description "was too general."  Tr. at 24:3-8 (Fine).

Pierre-Louis argued that, even if the stop was "justified at the inception," it was not reasonable in its scope, because he did not match Chavez' description of the assailant, resulting in his injuries.  Tr. at 24:15-22 (Fine).  The Court asked Pierre-Louis:

> [A]ssume for a second . . . that the stop was supported by reasonable suspicion. What if [Schake] had detained Pierre-Louis until Chavez was brought to the scene?  He didn't get him out of the vehicle, didn't put him on the ground, didn't point a gun at him or anything like that, but just detained him there?  If you buy my first assumption about reasonable suspicion supporting the stop, could he have -- and I know you disagree with that, but could he have [detained] him at least [until] Chavez was brought to clear up reasonable suspicion?  It seems to me he could.  If you buy that reasonable suspicion existed . . . at the stop you can hold the person until you dissipate the reasonable suspicion, and if you just left him in the car and just had Chavez come up and say it's not the car or it's not him or anything like that, and then let him go[,] it seems to me that one would follow from the other.

Tr. at 25:4-20 (Court).  Pierre-Louis said that the scope of the Court's hypothetical "would have been more justifiable," but noted that the "problem with that scenario is that" the Defendants "would get up and say, well, if [Schake] can detain him at that stage and he thin[k]s that [Pierre-Louis] may have a weapon he has to do something."  Tr. at 25:24-26:4 (Fine).  The Court said that

> the reason you can't concede that there was reasonable suspicion to stop [is] because once you concede that or if I conclude that, then it's -- it's difficult to fault the officer for then doing some of the things that he did because . . . of [the] allegation of . . . the gun being used in the crime.

Tr. at 26:5-13 (Court).  Pierre-Louis argued that Schake did not have enough information before

- 26 -

he "zip[ped] off to go conduct a high speed . . . chase," but that, even if the initial stop was justified at its inception, Schake should not have continued to detain Pierre-Louis once it became clear that Pierre-Louis did not match Chavez' description, such as that he had short hair and was not bald, Tr. at 26:14-27:6 (Fine), and did not have a black eye, Tr. at 31:17-32:1 (Fine).  Pierre-Louis asserted that Schake could have "done an immediate pat down . . . and then put Mr. Pierre-Louis back in his car without handcuffing" him, which would have prevented Pierre-Louis' torn rotator cuff, Tr. at 27:10-22 (Fine), and, because Schake searched Pierre-Louis' car before conducting the pat-down, he argued that the pat down "should have been done immediately to make sure there were no guns," Tr. at 28:21-25 (Fine).  In Pierre-Louis' view, "there were a lot of things that could have been done differently in terms of the stop that . . . would not be as intrusive or have resulted in damages that occurred in this case."  Tr. at 27:25-28:4 (Fine).

The Court asked Pierre-Louis to explain the second footnote in his Response, in which he said that it does not make a difference whether the stop is characterized as an investigative stop or an arrest.  See Tr. at 29:2-9 (Court).  Pierre-Louis responded that he did not think the distinction was important to determine whether the stop was justified at its inception, but that the distinction may be more important after the stop to determine if Schake's conduct, including in handcuffing Pierre-Louis, was reasonably related in scope to the reasons justifying the stop.  See Tr. at 29:11-30:9 (Fine).  The Court pointed out that Schake did not think he was arresting Pierre-Louis; Pierre-Louis said he wanted to "reserve my argument" that it was an arrest, because Pierre-Louis was handcuffed on the ground when Schake said he was not arresting Pierre-Louis, but explained that "I just didn't feel like it . . . furthered the dialogue," or "was important to the issues in this case," to focus on the distinction between an investigative stop and

an arrest.  Tr. at 30:10-22 (Court, Fine).    Pierre-Louis asserted that, assuming the stop was justified at its inception, Schake exceeded the permissible scope of the stop when he handcuffed Pierre-Louis, because Schake should have seen before that point that Pierre-Louis did not have a black eye.  See Tr. at 31:4-32:6 (Court, Fine).  In Pierre-Louis' view, "even if the initial cuffing was okay," Schake should "pat him down [and] release him from handcuffs"; Pierre-Louis contended that, had Schake so proceeded, "we wouldn't be here."   Tr. at 32:11-19 (Fine). Finally, Pierre-Louis directed the Court to United States v. Jones and Cortez v. McCauley, because "Jones is probably the most factually related case out there," and Cortez v. McCauley "is the primary case that we rely on . . . in terms of the doctrine that an arrest -- or a seizure is not  . . . reasonable if it's not based on objectively reasonable information."   Tr. at 33:2-11 (Fine).

The Court turned again to the Defendants, who responded to several points that Pierre-Louis made.  They noted that, when Pierre-Louis was handcuffed, Schake asked Pierre-Louis if he would rather sit in the car.  See Tr. at 34:21-25 (Cheves)(citing Dash Cam Tr. at 9:14-15 (Schake)).  The Defendants argued that, although Pierre-Louis indicated that Schake should have considered Chavez' appearance in determining whether the description was reliable, "I'm sure plaintiff's counsel would agree, that officers can't base their reliability on the way that people look."  Tr. at 35:24-37:3 (Cheves).  In the Defendants' view, "[b]ecause of the contemporaneous nature of this, the exigency of the circumstance, the gravity of what is being alleged, a gun being pulled, I think [Schake] believed that he had the opportunity to be able to stop the vehicle, given the identifiers that he did have."  Tr. at 36:15-20 (Cheves).   The Defendants argued that, although Chavez told Schake that his assailant was driving a white Expedition, an Explorer is

also a large SUV, and Schake was not relying only on the vehicle description when he stopped Pierre-Louis.  See Tr. at 36:20-23 (Cheves).  The Defendants emphasized that, throughout the interaction, Schake was "also making sure that Pierre-Louis understood why" he was stopped, and "even at one point Mr. Pierre-Louis said, 'I understand.'"  Tr. at 36:25-37:4 (Cheves).  In the Defendants' view, Schake acted reasonably, because he was thinking,

> I have a possible armed suspect, [Pierre-Louis] meets the identifiers that I have, I'm bringing . . . Chavez here to make a positive identification, and he explains this every step of the way to Mr. Pierre-Louis, and then at the end, when he is informed that he is not the person, he does release Mr. Pierre-Louis.

Tr. at 37:8-14 (Cheves).  The Defendants argued that Schake had enough identifiers to establish reasonable suspicion to stop Pierre-Louis, that the stop did not last "any longer than it had to," and that Schake released Pierre-Louis when he confirmed that Pierre-Louis "was not the person who [wa]s possibly on the highways of New Mexico with a gun and possibly endangering other individuals."  Tr. at 37:15-23 (Cheves).

The Court clarified with Pierre-Louis that, of the four claims he asserted in the Complaint, only one claim is a federal claim -- the claim against Schake for Constitutional violations -- and that the other three claims are state claims against Schake and the State of New Mexico.  See Tr. at 38:14-20 (Court, Fine).  The Court confirmed that the case was removed from state court, and asked, if it granted the MSJ on the federal claim, if it should remand the remaining claims to state court; Pierre-Louis and the Defendants agreed that remand would be proper.  See Tr. at 39:3-19 (Court, Fine, Cheves).

Pierre-Louis argued that Schake should have considered Chavez' appearance when he analyzed the reliability of the information which Chavez provided; Pierre-Louis asserted that he did not "want to make too much of the fact that Mr. Chavez had tattoos on his face when he

flagged down . . . Schake on the side of the road," but he emphasized that "Chavez was found with heroin needles and was eventually arrested because of that.  The person who Mr. Chavez identified was never found, he wasn't followed up.  There's a [reasonable] possibility that the story that Mr. Chavez gave was fabricated."  Tr. at 39:23-40:14 (Fine).  Pierre-Louis said it concerned him that "somebody could flag down an officer, somebody who has -- who could either be delusional or have mental illness problems" or for another unknown reason decides to make an incident report involving a white Expedition and a bald man, and that information would allow an officer to "high tail it down that freeway and pull over people who have similar vehicles" and "may not be bald, [but] have short hair."  Tr. at 40:14-22 (Fine).  The Court noted that "most criminals don't flag down police officers," and that, while the person making the report may be delusional or making a report for "malicious purposes," such a situation would be so remote that an officer who comes onto a scene with excited activity cannot "sit there" and "have to worry about the occasional delusional or malicious person."  Tr. at 40:24-41:9 (Court).  Pierre-Louis agreed that "a criminal is less likely to draw attention to himself," but pointed out "that's what happened here," and argued that an officer should receive information "with some level of skepticism" and should "analyze independently the reliability of that individual."  Tr. at 41:15-42:2 (Fine).  In Pierre-Louis' view, the Defendants' arguments are inconsistent, because, on one hand, they argue that "Chavez was very excited and almost barely incomprehensible and speaking really fast," but, on the other hand, they argued that Schake could rely on Chavez as a "reliable source to pull over any [large] white SUV on the interstate."  Tr. at 42:2-6 (Fine).  Pierre-Louis acknowledged that Schake made an effort to ensure that Pierre-Louis understood why he was stopped and detained, but argued that whether Schake was polite does not affect the

analysis.  See Tr. at 42:8-17 (Fine).

The Court said that, based on the Tenth Circuit's standards for reasonable suspicion, it thought that Schake may have had enough of a basis to make an investigative stop and that, based on the allegation that the assailant had a gun, then "there's going to be room for the officer to do what he did."  Tr. at 42:21-43:7 (Court).  It said that it would take the MSJ and Cross MSJ under advisement, but that it was inclined to grant the MSJ on the federal claim and then remand the remaining state claims to state court.  See Tr. at 43:7-10 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at *23 (D.N.M. June 28, 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[17]  Once the movant meets this burden, rule 56

_____

[17] Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof

requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).   Nor can a party "avoid summary judgment by repeating

---

operates; they disagreed as to how the standard was applied to the facts of the case.").

conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at 586-87] (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248 (1986).  When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller, [352 F.

App'x  289  (10th  Cir.2009)(Tymkovich,  J.)(unpublished),[18]]  explained  that  the  blatant

_____

[18] Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, How v. City of Baxter Springs, 217 F. App'x. 787, 793 (10th Cir. 2007)(unpublished), Lobozzo v. Colo. Dep't Of Corr., 429 F. App'x 707, 710 (10th Cir.

contradictions of the record must be supported by more than other witnesses' testimony[.]"

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation

omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury." Scott
> v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the
> plaintiff's version of the facts," id. at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," id. at
> 380.  In Scott, the plaintiff's testimony was discredited by a videotape that
> completely contradicted his version of the events.  550 U.S. at 379.  Here, there is
> no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
> testimony.  There is only other witnesses' testimony to oppose his version of the
> facts, and our judicial system leaves credibility determinations to the jury.  And
> given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory
> problems go to the weight of his testimony, not its admissibility. . . .
>
>      Mr. Rhoads alleges that his injuries resulted from a beating rendered
> without resistance or provocation.  If believed by the jury, the events he describes
> are sufficient to support a claim of violation of clearly established law under
> Graham v. Connor, 490 U.S. 386, 395–96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court" before

inquiring into whether there are genuine issues of material fact for resolution by the jury.  584

---

2011)(unpublished), United States v. Reed, 195 F. App'x 815, 821 (10th Cir.
2006)(unpublished), and Ortlieb v. Howery, 74 F. App'x 853, 854
(10th Cir. 2003)(unpublished), have persuasive value with respect to material issues, and will
assist the Court in its preparation of this Memorandum Opinion and Order.

F.3d at 1326–27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their]

constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The

Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C.

§ 1983.   See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is

inapplicable to Bivens[ v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971),] and

§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v.

Brown, 520 U.S. 397, 403 (1997).   "An entity cannot be held liable solely on the basis of the

existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas,

No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning,

J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).   Supervisors can be held

liable only for their own unconstitutional or illegal policies, and not for the employees' tortious

acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

      **1.**        **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'"

Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).   The under-

color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . .

furthers the fundamental goals of preserving an area of individual freedom by limiting the reach

of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for

conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir.

1995).  "The traditional definition of acting under color of state law requires that the defendant in

a § 1983 action have exercised power 'possessed by virtue of state law and made possible only

because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at

49 (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  <u>Jojola v. Chavez</u>, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1447 (quoting <u>Lugar v. Edmonson Oil Co.</u>, 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  <u>Jojola v. Chavez</u>, 55 F.3d at 493 (quoting <u>Lugar v. Edmonson Oil Co.</u>, 457 U.S. at 935-36 n.18; <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  <u>Jojola v. Chavez</u>, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

<u>David v. City & Cnty. of Denver</u>, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting <u>Martinez v. Colon</u>, 54 F.3d 980, 986 (1st Cir. 1995)).

- 39 -

2.    **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded: "[A] plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury complained-of under § 1983, and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

- 40 -

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."   Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."   Id.   In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.   See, e.g., Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."   Martinez v. Carson, 697 F.3d at 1255.   The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, then-Circuit Judge for the United States Court of Appeals for the Third Circuit, now-associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.   Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."   Trask v. Franco, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for
> reasonable difference of opinion as to whether such act was wrongful or
> foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.      Supervisory Liability.

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless

there is "'an affirmative link . . . between the constitutional deprivation and either the

supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise.'"

Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d

1296, 1302 (10th Cir. 1997))(internal alterations omitted).  Because supervisors can be held

liable only for their own constitutional or illegal policies, and not for the torts that their

employees commit, supervisory liability requires a showing that such policies were a "deliberate

or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal

quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.

The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the

'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate,

supervisory liability for government officials based on an employee's or subordinate's

constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-*26 (citing Dodds v.

Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape

for supervisory liability in <u>Ashcroft v. Iqbal</u> is as follows: "Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  556 U.S. at 676.  The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  <u>Dodds v. Richardson</u>, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after <u>Ashcroft v. Iqbal</u>:

> A plaintiff may [] succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

<u>Dodds v. Richardson</u>, 614 F.3d at 1199-1200 (citing <u>Summum v. City of Ogden</u>, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in <u>Bd. of Cnty. Comm'rs v. Brown</u>, the Tenth Circuit reasoned that two

of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.   **Municipal Liability**.

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that

- 44 -

there is a direct causal link between the policy or custom and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the

> plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227

(1991)(per curiam)).   "If qualified immunity is to mean anything, it must mean that public

employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457

U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.

Saucier v. Katz, 533 U.S. 194, 205 (2001), receded from by Pearson v. Callahan, 129 S. Ct. 808

(2009).  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the

defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was

clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d

1101, 1107 (10th Cir. 2009).

### 1.        Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a

qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts

"should be permitted to exercise their sound discretion in deciding which of the two prongs of

the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in <u>Saucier v. Katz</u> -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  <u>See</u> <u>Pearson v. Callahan</u> 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  <u>See</u> <u>Reichle v. Howards</u>, 132 S. Ct. 2088, 2093 (2012)(affirming <u>Pearson v. Callahan</u>'s procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  <u>See</u> <u>Cannon v. City & Cnty. of Denver</u>, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: When (i) the first, constitutional violation question "is so factbound that the decision

- 47 -

provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking" because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary and the conduct is likely only to face challenges in the qualified immunity context. Camreta v. Greene, 131 S. Ct. at 2031-32. See Kerns v. Bader, 663 F.3d at 1181.[19] "Courts should think carefully before

---

[19] In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

_____

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (u.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that
>
> > [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1

- 49 -

v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"   Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[20]   The Tenth Circuit will remand a case

---

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).

[20] In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

> While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

to the district court for further consideration when the district court has given cursory treatment

to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d

at 1182.

---

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

888 F. Supp. 2d at 1222 n.35.

2.      **Clearly Established Rights in the Qualified Immunity Analysis.**

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298

(10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). While a case directly on point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit

- 54 -

explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## LAW REGARDING FOURTH-AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business." 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed.

- 55 -

1996).   Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."   Oliver v. Woods, 209 F.3d at 1186.

### 1.    Investigative Detentions and Reasonable Suspicion.

An encounter that is not consensual may nevertheless be justified as an investigative detention.   An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."   Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).   Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.   First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."   Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).   Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc), overruling on other grounds recognized in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop."   United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).   This standard is met by

information "falling 'considerably short' of a preponderance standard." United States v. Winder, 557 F.3d at 1134.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . .").  A police/citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest which probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Terry v. Ohio, 392 U.S. at 29.  In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

The Tenth Circuit has recognized the doctrine in Terry v. Ohio of an investigative detention -- "stop" -- and of a protective search -- "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a

limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)).   The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.   United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194.  The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.  See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered did not, without more, give rise to reasonable suspicion, the combination of circumstances was sufficient.  See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.  See 355 F. App'x at 227-28.  A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.  See 355 F. App'x at 228.  Rather than leave,

however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See 355 F. App'x at 228.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected-crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck.  355 F. App'x at 228, 229.  Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit found that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant."  355 F. App'x at 229.  The Tenth Circuit explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian.  Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos.  Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.  The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229.  The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion.  The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."  355 F. App'x at 229.  The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur. See 355 F. App'x at 229.

In United States v. Aragones, No. CR 11-2142, 2012 WL 1764222 (10th Cir. May 18, 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's:

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

2012 WL 1764222, at *2.  At the district court level, in ruling on the motion to suppress, the Honorable Martha Vazquez, United States District Court Judge, had concluded that, because the defendant's conduct in standing outside a private residence and looking in "was consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct.  2012 WL 1764222, at *2 (quoting District Court Opinion at 19).  The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior."  2012 WL 1764222, at *3.  The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an

- 60 -

Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling."  2012 WL 1764222, at *2 (quoting Albuquerque Ord. § 12-2-21(B)).   The Tenth Circuit thus reversed Judge Vazquez' judgment, disagreeing with her finding that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 2012 WL 1764222, at *2.

### 2.     Arrests.

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest.  An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).  The use of handcuffs, however, does not always elevate a detention into an arrest.  See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest.").  "Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."   United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).  See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning,

J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'")(quoting Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000), aff'd, 11-2231, 2013 WL 923192 (10th Cir. Mar. 12, 2013).

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"   United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).   Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."   United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).   The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.   See Beck v. Ohio, 379 U.S. 89, 96 (1964).   "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."   United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000,

1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

The Supreme Court has directed that, in analyzing whether information received from an informant establishes probable cause, courts must look to the totality of the circumstances, and "make a practical, common-sense decision whether, given all the circumstances," including the informant's "'veracity' and basis of knowledge,'" there is a "substantial basis" for determining "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. at 239 (citations omitted).  The Tenth Circuit has recognized that the probable-cause determination using the totality of the circumstances test balances indicia of reliability and that, when there is sufficient independent evidence of corroboration, the informant's veracity need not be established:

> The Court explained that an informant's "veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report." However, "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."  Specifically, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant."

United States v. Artez, 389 F.3d at 1111 (internal citations omitted).  Thus, the Court has recognized that, "[i]n testing the sufficiency of probable cause, courts may look at information received from a [confidential informant] so long as other matters contained in the warrant corroborate the informant's statement."  United States v. Quezada-Enriquez, CR 06 2262 JB, 2007 WL 709047, at *5 (D.N.M. Feb. 5, 2007)(Browning, J), aff'd, 567 F.3d 1228 (10th Cir.

2009).  See United States v. Hager, 969 F.2d 883, 887 (10th Cir. 1992)(holding probable cause existed where independent investigation corroborated informant's report), abrogated by Bailey v. United States, 516 U.S. 137 (1995).  "Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct, because an informant who is right about some details is probably also right about others."  United States v. Lundy, 164 F. App'x 332, 334 (4th Cir. 2006)(internal quotations omitted).  See United States v. Gary, 24 F. App'x 862, 864-65 (10th Cir. 2001)(finding probable cause existed where an independent investigation corroborated the "innocent information" an informant provided); 79 C.J.S. § 67, Searches and Seizures (stating that an informant's information may establish probable cause where it is corroborated by independent police work, an additional informant, or other personal knowledge of an officer; "[e]ven corroboration of portions of the information which do not in and of themselves involve criminal activity may be sufficient").

The Tenth Circuit has held that "[a] tip from an anonymous or confidential informant that narcotics are being distributed at a particular location may be corroborated through the arrangement of a controlled purchase at the suspect location."  United States v. Artez, 389 F.3d at 1111.  The Tenth Circuit has noted:

> The common formalities observed by police officers when conducting such controlled purchases are as follows: the police search the informant (and his vehicle, if appropriate) for money and contraband prior to the buy; give the informant money with which to purchase the narcotics; transport the informant to the suspect residence (or follow the informant to the residence); watch the informant enter the suspect residence, disappear while inside the suspect residence, and emerge from the suspect residence; search the informant upon exiting the suspect residence; and receive the narcotics from the informant.

United States v. Artez, 389 F.3d at 1111-12 (internal footnote omitted).  "[T]he absence of constant visual contact with the informant conducting the transaction does not render a

controlled purchase insufficient, nor does the absence of an audio-recording of the transaction."

United States v. Artez, 389 F.3d at 1112.

In United States v. Richardson, 86 F.3d 1537 (10th Cir. 1996)(cited with approval in United States v. Artez, 389 F.3d at 1112), abrogation on other grounds recognized by United States v. Pearce, 146 F.3d 771, 774 (10th Cir. 1998), the Tenth Circuit held that probable cause existed based on a controlled purchase in which the officers had not before used the unwitting informant, Stone, and did not see the defendant, Richardson, provide the drugs to Stone, which the confidential informant ("CI") then provided to the officers once the CI left Stone's presence. See 86 F.3d at 1545.   The CI, who had "numerous prior cocaine transactions with Mr. Richardson and Mr. Stone," called the police officers and told them "that he could arrange a large cocaine transaction involving Mr. Richardson and Mr. Stone."   86 F.3d at 1545.   The officer in charge verified the participants' identities and then coordinated a controlled purchase, which progressed as follows:

> After Officer Cash verified the alleged participants' identities, a meeting was arranged. Officer Cash observed the informant enter Mr. Stone's vehicle to make a cocaine purchase. The informant returned from Mr. Stone's vehicle and informed Officer Cash that he had given Mr. Stone cash and that Mr. Stone was going to Mr. Richardson's residence to acquire the cocaine. Other officers observed Mr. Stone enter the driveway of Mr. Richardson's residence, exit his vehicle, disappear from sight for twenty minutes, return to his vehicle and depart. Officer Cash then observed Mr. Stone's return from Mr. Richardson's residence. The informant again entered Mr. Stone's vehicle and returned with cocaine.

86 F.3d at 1545.  The Tenth Circuit concluded that these facts provided sufficient probable cause to search Richardson's home, because the informant's tip to officers that Mr. Stone could obtain drugs from the defendant "was corroborated by a controlled narcotics purchase and the observation of [the defendant's] residence."  86 F.3d at 1545.

- 65 -

3.      **When a Detention Becomes an Arrest**.

The Tenth Circuit has held that a police/citizen encounter which goes beyond the limits of an investigative stop is an arrest which must be supported by probable cause or consent to be valid. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462.  "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. 491 (1983)).

This Court has before engaged in the balancing act of when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005), the Court had to determine whether the police involved transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at

974.  See United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'"  United States v. Perea, 374 F. Supp. 2d at 974.  See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's use of "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "upholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action

designed to provide for the safety of the agents."). <u>United States v. Perea</u> was one of those unique cases, because the police had reasonable cause to believe that the person that they were detaining was, in fact, the suspect that they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and dangerous. <u>See</u> 374 F. Supp. 2d at 976. The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat. The measures taken during a <u>Terry</u> stop must be reasonably related in scope to the circumstances which justified the interference in the first place and may not go beyond what is necessary for officer safety. The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous. The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat. The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

<u>United States v. Burciaga-Burciaga</u>, 147 F. App'x 725, 730 (10th Cir. 2005)(citations omitted)(internal quotation marks omitted).

## LAW REGARDING UNLAWFUL ARREST

"A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause." <u>Olsen v. Layton Hills Mall</u>, 312 F.3d 1304, 1312 (10th Cir. 2002)(citing <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985)). "The law . . . is unambiguous: a government official must have probable cause to arrest an individual." <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1117 (10th Cir. 2007)(citing <u>Tennessee v. Garner</u>, 471 U.S. at 7). <u>See</u> <u>Michigan v. DeFillippo</u>, 443 U.S. 31, 36 (1979)("[T]he Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense."). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she had

reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  Keylon v. City of Albuquerque, 535 F.3d 1210, 1216 (10th Cir. 2008)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).  The Supreme Court has stated that the existence of probable cause for an arrest depends on whether, based on historical facts leading up to the arrest, an objectively reasonable police officer would find probable cause:

> The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause.  The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."

Ornelas v. United States, 517 U.S. 690, 696-97 (1996)(quoting Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19 (1982))(alterations in original).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute . . . ."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331-32.

1.     **Supplemental Jurisdiction**.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552. The Supreme Court has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines -- pendent and ancillary jurisdiction.[21] "Historically, courts tended to use the term 'pendent' to refer to non-federal, non-diversity claims asserted by the plaintiff in a federal question case. And they tended to use 'ancillary' to refer to non-federal, non-diversity claims asserted in a diversity of citizenship case by parties *other* than the plaintiff." 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, & Richard D. Freer, Federal Practice and Procedure § 3523, at 155-56 (3d ed. 2008)(emphasis in original)(footnote omitted). Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). Ancillary jurisdiction gives federal courts the flexibility to "entertain[] a non-federal, non-diversity claim asserted by a party other than the plaintiff, usually in a diversity of citizenship case," although occasionally in admiralty cases as well. 13 Wright et. al., supra,§ 3523, at 173 & n.45.

In 1988, Chief Justice William H. Rehnquist created the Federal Courts Study Committee

---

[21] The Tenth Circuit has noted that Congress' intent in passing 28 U.S.C. § 1367 was to supersede the common-law doctrine of pendent jurisdiction: "Effective December 1, 1990, Congress enacted legislation, codified at 28 U.S.C. § 1367 (1976 & Supp. 1992), which supersedes the common law pendent jurisdiction doctrine." Baker v. Bd. of Regents of State of Kan., 991 F.2d 628, 634 (10th Cir. 1993)(citing Whalen v. Carter, 954 F.2d 1087, 1097 (5th Cir. 1992), and Aschinger v. Columbus Showcase Co., 934 F.2d 1402 (6th Cir. 1991)).

to analyze the federal court system and to recommend reforms.  See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at * 5 (D.N.M. November 21, 2011)(Browning, J.)(citing 16 Moore's Federal Practice § 106.04[5], at 106-22 (Matthew Bender 3d ed. 2013)).  In response to the Committee's findings regarding pendent and ancillary jurisdiction, Congress codified the application of the two doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence." Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990). Congress codified both ancillary and pendent jurisdiction "under the generic rubric 'supplemental' jurisdiction" in 28 U.S.C. § 1367, although "courts and lawyers routinely continue to use 'ancillary' and 'pendent' as well as 'supplemental' interchangeably to refer to *any* situation in which a federal court entertains a claim or proceeding that by itself would not invoke an independent basis of federal subject matter jurisdiction."  13 Wright et. al., supra, § 3523, at 156 (emphasis in original).

### 2.    District Court Discretion.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of

Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing

City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the

supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains

discretion to decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme

Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial

economy, convenience and fairness to litigants" when deciding whether to exercise supplemental

jurisdiction.  383 U.S. at 726.  Similarly, Congress' supplemental jurisdiction statute enumerates

four factors that the court should consider:

> (1)     the claim raises a novel or complex issue of State law,
>
> (2)     the claim substantially predominates over the claim or claims over which
>          the district court has original jurisdiction,
>
> (3)     the district court has dismissed all claims over which it has original
>          jurisdiction, or
>
> (4)     in exceptional circumstances, there are other compelling reasons for
>          declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise

supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness,

and comity . . . ."  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

    Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the

district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions

of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian

News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir.1998)("[S]ection 1367 has

indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir.

1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims

only in the four instances described therein."); Executive Software N. Am. v. U.S. Dist. Court, 24 F. 3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c) . . . .")(emphasis in original); Bonadeo v. Lujan, No. CIV 08–0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. April 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists."); Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)). The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims

should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726.  The Court has previously stated that the Supreme Court and the Tenth Circuit have indicated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies.  See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. September 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it.").  The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'"   Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished).

## ANALYSIS

Schake seized Pierre-Louis for Fourth Amendment purposes when Schake stopped Pierre-Louis.  An investigative stop "is reasonable if it is justified by articulable reasonable suspicion that the person detained has committed or is about to commit a crime."  United States v. De La Cruz, 703 F.3d 1193, 1196 (10th Cir. 2013)(citing Florida v. Royer, 460 U.S. 491, 498 (1983)).   There is a two-step inquiry to determine if an investigative stop is reasonable: (i) "whether the detention was justified at its inception"; and (ii) "whether the agents' actions were reasonably related in scope to the circumstances initially justifying the detention."  United States v. De La Cruz, 703 F.3d at 1196.  Pierre-Louis contends that the stop was not justified at its inception and that, even if Schake had reasonable suspicion to stop him, Schake should have

- 74 -

released him after seeing that he did not fit the alleged assailant's description.[22]  The Defendants

argue that Schake had reasonable suspicion to stop Pierre-Louis and that his actions during the

detention were related in scope to the threat he perceived.

## I.      SCHAKE HAD REASONABLE SUSPICION TO STOP PIERRE-LOUIS.

The parties disagree whether Schake had reasonable suspicion to stop Pierre-Louis, that

is, whether the stop was justified at its inception.  "Reasonable suspicion is 'something more

than an inchoate and unparticularized suspicion or hunch,' but 'is considerably less than proof by

a preponderance of the evidence or [proof] required for probable cause." United States v. De La

Cruz, 703 F.3d at 1196 (alteration in original)(quoting United States v. Chavez, 660 F.3d 1215,

1221 (10th Cir. 2011)(internal quotation marks omitted)).  "Reasonable suspicion is measured by

an objective standard; the agents' subjective beliefs and intentions, therefore, are irrelevant."

United States v. De La Cruz, 703 F.3d at 1196 (citing Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2082

(2011).  To determine if Schake acted reasonably, the Court should consider "whether, in light

of all the pertinent information known to [Schake] at the time of the stop, [his] conduct was

reasonable."  United States v. Merritt, 695 F.2d 1263, 1272 (10th Cir. 1982).  Pierre-Louis points

to three reasons why Schake's decision to pull him over was unreasonable: (i) it was based on

"Chavez' account of his victimization, which was not reliable"; (ii) it was based on "Chavez'

description of his alleged assailant, which was not sufficiently detailed to give rise to any

objectively reasonable articulable suspicion that Plaintiff had committed a crime"; and

---

[22] Pierre-Louis frames his argument using the investigative stop inquiry, see Response at 7, but argues that, in the second step of the analysis, Schake exceeded the scope of the detention by arresting him, see Response ¶ 12, at 3(disputing the Defendants' legal conclusion that he was not arrested when he was handcuffed and detained, and quoting Cortez v. McCauley, 478 F.3d at 1115-16, for the proposition that the "'use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest'").

(ii) because Pierre-Louis did not match "Chavez' sparse description of the alleged assailant." Response at 7.

### A.     SCHAKE ACTED REASONABLY IN DETERMINING THAT CHAVEZ WAS A RELIABLE SOURCE.

Pierre-Louis contends that Schake should not have relied on Chavez' account, in part because of inconsistencies in what Chavez told Schake, see Response at 8 (asserting that Chavez offered differing accounts of what happened to him and what direction the assailant would be traveling, and did not know the assailant's name despite having been in the same vehicle with him), because of Chavez' appearance with tattoos on his face, and because the police later found heroin needles in his backpack.  Pierre-Louis points to Cortez v. McCauley to demonstrate that "[a]n objectively reasonable seizure cannot be based on unreliable information."  Response at 8. In that case, the source of information was a "barely-verbal two-year old child" who said that "her babysitter's 'boyfriend' had 'hurt her pee pee.'"  478 F.3d at 1116.

> The statement was relayed by telephone to the officers, from the nurse, who heard it from the mother who ostensibly heard it from the two-year old.  Rather than waiting to receive the results of the medical examination of the child, interview the child or her mother to better understand the circumstances, or seek to obtain a warrant, the officers responded to the statement with an immediate arrest of the babysitter's husband, Rick Cortez.

478 F.3d at 1116.  The Tenth Circuit determined that the "unsubstantiated double-hearsay originating from a two-year-old, standing alone, does not give rise to probable cause" and did not support arresting the babysitter's husband, 478 F.3d at 1118, and further, because the two-year-old's statement did not assert any wrongdoing against the babysitter, the allegation did not give rise to reasonable suspicion to detain the babysitter for an investigative detention, see 478 F.3d at 1123.

Pierre-Louis points to Cortez v. McCauley to demonstrate that "an arrest that was not based on 'reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime' violated the Fourth Amendment."  Response at 8 (quoting Cortez v. McCauley, 478 F.3d at 1116).  As an initial note, the Tenth Circuit made the statement on which Pierre-Louis is relying in the context of an arrest, which requires probable cause, and not an investigative detention, which requires reasonable suspicion; the Tenth Circuit explained that "[p]robable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime."  478 F.3d 1108.  Although the Tenth Circuit did not discuss the child's reliability or trustworthiness when it analyzed whether there was reasonable suspicion to detain the babysitter, the reliability of the source of the information can be considered as part of the "totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing."  478 F.3d at 1123 (internal quotation marks omitted).  The Supreme Court has explained that a police officer may have reasonable suspicion based on information supplied by another person, but that the officer should assess the reliability of that person:

> Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability.  One simple rule will not cover every situation.  Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized.  But in some situations -- for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime -- the subtleties of the hearsay rule should not thwart an appropriate police response.

Adams v. Williams, 407 U.S. 143, 147 (1972).

When Chavez flagged Schake down, reported that he had been assaulted "right now," and described the alleged assailant, Schake acted reasonably in concluding, in a split second, that he could rely on Chavez' account.  Chavez sought immediate police aid after an alleged assault and was still excited from the incident, and, if Schake were to have any hope of finding the assailant, he had to act quickly.   Pierre-Louis has not elaborated why Chavez' tattoos should have indicated to Schake that Chavez was unreliable; the Court recognizes that some gangs use facial tattoos to indicate membership or to identify certain crimes a person has committed, but facial tattoos may also be innocent.  Further, while a police officer should consider the reliability of a person who is reporting criminal activity, the fact that a person may have, in the past, been involved in criminal activity, does not mean that the police can never help that person when he or she has been victimized.  Police officers can and should use their experience to determine the best course of action, including determining whether a person in the immediate situation can be trusted, or if he or she has a malicious intent.  Schake must have determined here that Chavez was honestly reporting an assault, and the Court is not willing to say that Schake's conclusion is unreasonable simply based on the fact that Chavez had tattoos on his face.

This situation is also unlike the multiple layers of hearsay in Cortez v. McCauley, because Schake spoke directly with Chavez shortly after the alleged crime occurred.  Chavez appeared to still be excited and frightened from the crime, and Schake needed to take immediate action.  Although the police found heroin syringes in Chavez' backpack after Schake stopped Pierre-Louis, Schake was not aware of the syringes at the time he had to make the decision whether to pursue a person who could be armed and dangerous.  The Court notes that it is

unlikely that someone who has contraband would intentionally attract the police's attention, and while Schake was not aware of the syringes until after he stopped Pierre-Louis, the Court does not think that the fact that Chavez had heroin syringes in his backpack undermines any credibility he had in reporting the assault.  The Court concludes that Schake acted reasonably in concluding that Chavez could be trusted in reporting an alleged crime that took place "right now."

>    **B.    SCHAKE  HAD  SUFFICIENT  INFORMATION  TO  INITIATE  THE SEARCH FOR THE ALLEGED ASSAILANT AND HAD REASONABLE SUSPICION TO BELIEVE THAT PIERRE-LOUIS WAS THE ALLEGED ASSAILANT.**

Schake had five pieces of information before he began searching for Chavez' alleged assailant: (i) that the assault had happened "right now"; (ii) the assailant drove a white Expedition; (iii) the assailant was bald; (iv) the assailant had a black eye; and (v) the assailant was the only person in the vehicle.  Pierre-Louis argues that Schake should have investigated further before initiating the search, and that Schake performed "careless police work" by not spending "an additional thirty to sixty seconds" with Chavez to glean the additional information that Chavez provided later, including the assailant's race, weight, height, and wardrobe. Response at 9.  Pierre-Louis directs the Court to <u>United States v. Jones</u> as a Tenth Circuit case which demonstrates that a tip must have sufficient detail before it can support reasonable suspicion.  In <u>United States v. Jones</u>, the

> police received a report from an apartment manager that one of his tenants had told him two African-American men had pounded hard on the door of a neighbor's apartment.  One was holding a gun.  The tenant then came on the line and reported the men had left without entering the apartment, driving a black Mercedes westbound.  He stated that both were wearing a lot of jewelry, and that one was wearing an expensive purple sweater.

998 F.2d at 884.  Shortly after, the police spotted a black Mercedes that was a mile and a half

west of the apartment, and discerned that two African-American men were in the car -- the driver

and a back-seat passenger -- but that there was also a woman and a six- or seven-year-old child

in the front seat.  See 998 F.2d at 884.  When the car stopped at a grocery store,

> four or five police vehicles converged on the scene.  The occupants (who included
> a second child whom the officers had not previously noticed) were ordered out of
> the car, and both men were handcuffed.  A frisk revealed no weapons.  The
> officers, however, observed through an open car door a clear plastic bag
> protruding from beneath the center arm rest in the back seat.  When one of the
> officers pulled it out, he discovered that it contained crack cocaine.  Defendant,
> who had been riding in the back seat, was arrested.

998 F.2d at 884.  The district court declined to suppress the cocaine, but the Tenth Circuit

reversed.  See 998 F.2d at 884, 886.

The Tenth Circuit explained that, to have reasonable suspicion to stop the car, the officers

had to make three questionable inferences: "(a) that they had found the car that they were

looking for; (b) that the report of the disturbance was reliable; and (c) that the men who left the

scene of the disturbance had been, were, or were about to be engaged in criminal activity."  998

F.2d at 886.  On the first problem, the Tenth Circuit explained that "[t]he police officers who

stopped this car did so on very meager evidence," and pointed out that the disturbance took place

five minutes before the police stopped the vehicle, the officers could not see the men's clothing

when they initiated the stop, they did not have any distinguishing features of the car, "such as a

partial license plate or a dent," they did not know what direction the car would be traveling, and

they stopped the vehicle "in Albuquerque, a major population center, at 4:00 p.m. on a weekday

afternoon," and the "record contains no evidence suggesting that the area within a five minute

drive from the scene of the disturbance was either sparsely populated or lightly driven."  998

F.2d at 884-5-85.  Further, the Tenth Circuit pointed out several factors that "suggested this was

not the car they were looking for," including that there were children in the car, as it would be

unlikely to bring children to an armed confrontation; that the car was "on a street that, by the

officers' own admission, could only be reached from the disturbance by a circuitous route"; and

that the car stopped at a grocery store.  998 F.2d at 885.  After initiating the search, the police

also could see that the men's wardrobe did not match the report.  See 998 F.2d at 886 n.4.

> Nevertheless, the officers singled out this car, out of all the cars in the area, for a massive intrusion based solely on the color and manufacturer of the car, and the fact that it contained two black men. There is no information in the record as to the number of black Mercedes owned by African–Americans in Albuquerque, and we will not speculate as to the statistics.  Absent a strong showing, on the record and based on objective statistics, that the sight of two African–Americans in a black Mercedes was a highly unusual event, we cannot sanction the officers' claim that this flimsy evidence provided them with a reasonable suspicion that they had found the car that fled the disturbance.

998 F.2d at 885 (footnote omitted).

On the second questionable inference -- that the report of the disturbance was reliable –

the Tenth Circuit noted that "the information that the police were acting on came from an

informant with whom they had no experience," and that the police did not observe suspicious

behavior to corroborate the tip.  998 F.2d at 886.  On the third inference -- that "the men who left

the scene of the disturbance had been, were, or were about to be engaged in criminal activity,"

the Tenth Circuit pointed out that the tip reported that "one of the men involved in the

disturbance was holding a gun and that the men were pounding hard on an apartment door,"

which the officers admitted were not crimes in New Mexico.  998 F.2d at 886.

> Of the three inferences necessary to reach a conclusion of reasonable suspicion, the first was fatal, and all three were weak.  Looking to the three inferences piled on top of each other, the support for the ultimate conclusion that an investigatory

stop was justified fell far short of the minimum requirements of the Fourth Amendment.

998 F.2d at 886. In concluding, the Tenth Circuit said that it did "not suggest that the level of the intrusion was inappropriate if the officers indeed had a reasonable suspicion that the vehicle contained armed criminals," but because the Tenth Circuit found that the officers did not have reasonable suspicion to stop the car, reversed and remanded the case. 998 F.2d at 886.

Regarding the last two questionable inferences -- whether "the report of the disturbance was reliable," and whether "the men who left the scene of the disturbance had been, were, or were about to be engaged in criminal activity," 998 F.2d at 886 -- the Court does not think the same weaknesses exist in this case. As the Court has already stated, Schake could reasonably rely on Chavez' report; even though Schake did not know Chavez and did not independently corroborate Chavez' report, Chavez was reporting a crime that had taken place "right now," and was still excited and frightened from the incident. This situation is closer to the report that the Supreme Court envisioned when it described a tip from "the victim of a street crime seek[ing] immediate police aid and giv[ing] a description of his assailant." Adams v. Williams, 407 U.S. at 147. Further, Chavez was not just reporting suspicious behavior; he reported criminal activity, because the driver of the vehicle allegedly threatened him with a firearm. Schake did not have to "'pil[e] inference upon inference'" to conclude that the driver had "engaged in criminal activity." United States v. Jones, 998 F.2d at 886 (quoting Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943)).

The more difficult issue is the similarities between United States v. Jones and this case on the first question -- whether the police had sufficient information to locate a car and whether they had in fact located the correct car. Ultimately, however, the Court does not think this case

- 82 -

suffers from the same flaws as in United States v. Jones.  Pierre-Louis points out that Schake did not have a lot of information regarding the alleged assailant or the assailant's vehicle before he initiated the search, making identification of the correct vehicle more difficult, similar to how the officers in United States v. Jones did not have enough information to ensure that they found the correct vehicle.  Schake acted on a report that the vehicle was a white Expedition, but he did not have any portion of the license plate number or any identifying characteristics about the vehicle to differentiate it from other white Expeditions that may have been on the road.  Schake also did not know much about the alleged assailant's appearance, such his race or build, which could have helped detect the assailant while driving.  There are some important differences, however, between United States v. Jones and this case.  Although Schake did not have much information regarding the vehicle, he knew that the incident had happened "right now."  The timing of the tip and when Schake began searching for the vehicle limited the scope of his search; he was not searching in a busy city.  Although he was looking on I-40, the incident took place outside of Albuquerque rather than inside.  Chavez flagged Schake down between mile marker 145 and 146, see MSJ ¶ 2, at 2, which the parties indicated is about ten miles west of Albuquerque, see Tr. at 12:9-24 (Court, Cheves, Fine).  The parties did not indicate how busy traffic was on I-40 at the time Chavez flagged down Schake and when Schake stopped Pierre-Louis, but after viewing the Dash Cam Video, the Court does not think it was particularly busy: from the start of the video to when Chavez flagged down Schake, a period of about one minute, Schake passed three vehicles, see Dash Cam Video at 1:41:53-1:42:52; during the minute and a half that Schake was stopped on the side of I-40 talking with Chavez, twenty-one vehicles passed him, see Dash Cam Video at 1:42:51-1:44:16.  It would have been preferable for Schake to have more information,

but he had to balance the need to act immediately to have any chance of stopping a person he believed to be armed and dangerous.  That he did not find out more information from Chavez about the assailant's physical characteristics or about the vehicle he was driving is not fatal to a finding of reasonable suspicion to initiate the search.

When Schake stopped Pierre-Louis, he did not match the description perfectly, but several indicators were similar: (i) Schake found Pierre-Louis shortly after initiating the search, consistent with the assault having taken place shortly before Schake spoke with Chavez;[23] (ii) Pierre-Louis drove a white Explorer, which is similar to a white Expedition in that it is a relatively large white SUV that Ford makes;[24] (iii) Pierre-Louis had short hair, and Schake said Pierre-Louis "appeared" to be bald or have very short hair; and (iv) he was the only occupant of

---

[23] The Court notes that Schake stopped Pierre-Louis in the general proximity as he expected to find Chavez' alleged assailant, but it cannot use the direction that Pierre-Louis was travelling to support a finding of reasonable suspicion; although there is some evidence that Chavez told Schake the assailant would be traveling east, see Schake Incident Report ¶ 2, at 1, and Pierre-Louis was traveling east when Schake stopped him, the Court did not find as undisputed that Chavez told Schake the assailant would be traveling east.

[24] The 2009 Ford Explorer XLT V6 is 193.4 inches long, 73.7 inches wide, and 71.9 inches tall; the 2009 Ford Expedition XLT is 206.5 inches long, 78.8 inches wide, and 77.2 inches tall.   See Compare Cars, Cars.com, http://www.cars.com/go/compare/trim Compare.jsp?acodes=USB90FOS301A0,USB90FOS101A0 (last visited April 29, 2014).  U.S. New and World Report ranks the 2014 Ford Explorer nineteenth out of twenty-three on its Affordable Midsize SUV list, see Ford Explorer Review, U.S. News and World Report Best Cars, http://usnews.rankingsandreviews.com/cars-trucks/Ford_Explorer/ (last visited April 29, 2014), while it ranks the 2014 Ford Expedition third out of eight on the Affordable Large SUV list, see Ford Expedition Review, U.S. News and World Report Best Cars, http://usnews.rankingsandreviews.com/cars-trucks/Ford_Expedition/ (last visited April 29, 2014).

In the years leading up to the incident, Ford sold more Explorers than Expeditions. Ford's yearly American sales of the Explorer was 78,439 in 2008; 52,190 in 2009; 60,687 in 2010; and 135,179 in 2011.  See Ford Explorer, Wikipedia, en.wikipedia.org/wiki/Ford_Explorer (last visited April 30, 2014).  Ford's yearly American sales of the Expedition was 55,123 in 2008; 31,655 in 2009, 37,336 in 2010; and 40,499 in 2011.  See Ford Expedition, Wikipedia, en.wikipedia.org/wiki/Ford_Expedition (last visited April 30, 2014).

the vehicle.  Further, Schake likely would not have been able to see if Pierre-Louis had a black

eye before he stopped Pierre-Louis.  The Court does not think that the discrepancies between

Chavez' description and Pierre-Louis are fatal to a finding of reasonable suspicion, because there

were enough similarities, along with Pierre-Louis' proximity to the scene, that the totality of the

circumstances support reasonable suspicion.  Pierre-Louis points to <u>Romero v. Story</u> to argue

that Schake could not rely on Pierre-Louis' proximity to the alleged crime, but the Court does

not agree that <u>Romero v. Story</u> forecloses it from relying, in part, on Pierre-Louis' proximity to

the scene.  In <u>Romero v. Story</u>, Aaron Diaz heard a loud noise outside his apartment, and when

he went outside, he saw that someone had vandalized his vehicle and that there was a Hispanic

male in the same parking lot as his vehicle.  <u>See</u> 672 F.3d at 883.  Diaz called the police to report

the vandalism and then again to tell the police that the Hispanic male had entered Apartment 17;

the defendant police officers knocked on the door to Apartment 17, and the plaintiff, a Hispanic

male, opened the door.  <u>See</u> 672 F.3d at 883.  The officers told him to take his hands from his

pockets, which he did, but when he turned back toward the apartment, not understanding why the

officers were at his door, the officers grabbed him, brought him to the ground, handcuffed him,

and placed him under arrest.  <u>See</u> 672 F.3d at 883.  The plaintiff sued for unlawful arrest and for

using excessive force in violation of the Fourth Amendment.  <u>See</u> 672 F.3d at 883.  The officers

moved for summary judgment on the basis of qualified immunity, but the district court denied

the motion, because it concluded that the officers did not have probable cause to arrest the

plaintiff and did not have reasonable suspicion that the plaintiff had vandalized the vehicle.  <u>See</u>

672 F.3d at 884.  The Tenth Circuit affirmed the district court's decision that the officers lacked

reasonable suspicion to detain the plaintiff, because the plaintiff's "temporal and geographic

proximity to the crime *alone* is not sufficient in this case to provide Defendants with reasonable suspicion."  672 F.3d at 887 (emphasis in original).  The Tenth Circuit compared two Tenth Circuit cases discussing reasonable suspicion:

> In determining Defendants lacked reasonable suspicion to detain Plaintiff, the district court relied on our holding in United States v. Davis, 94 F.3d 1465 (10th Cir. 1996) to conclude reasonable suspicion does not arise when an officer knows only a man was in a parking lot at the time of a vandalism.  In Davis, law enforcement officers in a marked police car observed an automobile with four occupants parked just north of a "juice joint," a business that sells liquor without a license.  Id. at 1467.  Davis exited his car and made eye contact with a law enforcement officer, broke eye contact, and then began walking toward the juice joint with his hands in his pockets.  Id.  The law enforcement officer knew Davis was an ex-convict who had been acquitted of a gang-related homicide and that Davis was associated with a gang.  Id.  The officer also had received information Davis had been selling narcotics.  Id.  But none of the officer's prior contact with criminal activity in the area of the juice joint had involved Davis.  Id.  We held none of these factors, standing alone or taken together, provided the officer with "a particularized and objective basis for suspecting the person stopped of criminal activity."  Id. at 1468 (internal quotations omitted).
>
> Defendants suggest our holding in Davis is distinguishable.  In support, Defendants argue the law enforcement officers in Davis were not investigating a specific crime and did not have a non-anonymous tip.  Defendants believe our holding in United States v. Sanchez, 519 F.3d 1208 (10th Cir. 2008), is on point.  In Sanchez, a woman driving a van flagged down two law enforcement officers.  Id. at 1211.  The woman "was very excited" and told the officers she had seen a man in a gray shirt striking a woman in the face at a nearby intersection.  Id.  The officers immediately drove to the intersection, which was one block away.  Id.  They observed a blue sedan and a white van pulling away quickly from a house.  Id.  Neighbors at the scene were pointing to the two vehicles "as if to say 'that's them.'"  Id.  Even though the tip was anonymous, we held the officers had reasonable suspicion to stop the suspects who pulled away from the alleged scene of the crime.  We reasoned that the tip was not overly general because the woman in the van described an aspect of the assailant's clothing and because her tip was spatially specific.  Id. at 1214.  We also concluded the fact the automobiles were speeding away while a number of people pointed to those vehicles was "significant."  Id. at 1214-15.

Romero v. Story, 672 F.3d at 886-87.  The Tenth Circuit emphasized that Diaz did not see who committed the vandalism; the only thing potentially implicating the Hispanic male was that he was in the parking lot when Diaz saw that his car had been vandalized.  See 672 F.3d at 887-88.

> A person of a particular race standing in a parking lot where a crime occurred is not enough to create reasonable suspicion.  Here the district court did not have facts before it of flight from the parking lot, nervous behavior, or any other factors, that if examined with the tip, would create reasonable suspicion under the totality of the circumstances.  Accordingly, we hold Defendants lacked reasonable suspicion to detain Plaintiff in connection with the vandalism of Diaz's automobile.

672 F.3d at 888.

The Court concludes that this case is more similar to United States v. Sanchez than to Romero v. Story or United States v. Davis, because, unlike the latter two cases, Chavez witnessed and reported criminal conduct, and not just suspicious behavior or unfortunate proximity to a crime.  Chavez reported that the driver of the white Expedition had committed a crime, whereas, in Romero v. Story, Diaz reported that a crime had occurred and that he saw a Hispanic male in the same parking lot when he discovered the vandalism.  Chavez described his assailant and the assailant's vehicle, albeit not in much detail, but Schake found Pierre-Louis in the area that corresponded with the incident having occurred "right now," Pierre-Louis was the sole occupant in the vehicle, and he appeared to be bald or have very short hair.  Although Pierre-Louis was driving a white Explorer, and not a white Expedition, the vehicles are both relatively large, Ford SUVs.  It was not unreasonable for Schake to stop a similar vehicle given the other descriptors that seemed to match and indicated that Schake had found the correct vehicle.  The Court concludes that Schake had reasonable suspicion to stop Pierre-Louis and, thus, that the stop was justified at its inception.

## II.   **SCHAKE'S ACTIONS IN DETAINING PIERRE-LOUIS WERE REASONABLY RELATED IN SCOPE TO THE CIRCUMSTANCES INITIALLY JUSTIFYING PIERRE-LOUIS' DETENTION**.

Pierre-Louis contends that Schake exceeded the scope of the search by detaining him, in handcuffs, for fifteen minutes, while Schake investigated a suspected aggravated assault that had just occurred.   The Defendants assert that Schake did not arrest Pierre-Louis.   The Court sees three potential ways that Schake's actions could have exceeded the scope of the circumstances: (i) approaching Pierre-Louis with his gun drawn and placing Pierre-Louis in handcuffs; (ii) detaining Pierre-Louis for about fifteen minutes while waiting for Chavez to identify Pierre-Louis, and to confirm or to deny that he was the assailant; and (iii) keeping Pierre-Louis handcuffed after performing a pat-down search.   The Court concludes that Schake's actions were reasonable given the circumstances.

First, Schake acted reasonably when he approached Pierre-Louis with his gun drawn and when he initially handcuffed Pierre-Louis.   Pierre-Louis argues that Schake's use of handcuffs exceeded the scope of the investigative detention, and points to Cortez v. McCauley, in which the Tenth Circuit said: "[T]he use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest."   478 F.3d at 1115-16 (internal quotation marks omitted).   Later in the same opinion, however, the Tenth Circuit explained that "given evidence of officer safety concerns, officers may in appropriate circumstances take steps to protect their personal safety and maintain the status quo during a Terry stop."   478 F.3d at 1130.

> Although Terry stops are normally non-intrusive, we have indicated that law enforcement may (1) display some force, (2) place suspects on the ground, (3) use handcuffs, or (4) detain suspects in law enforcement vehicles, even in the absence of probable cause.   At the same time, an unreasonable level of force transforms a

Terry detention into an arrest requiring probable cause.

478 F.3d at 1130 (citations omitted)(internal quotation marks omitted).   The Court has previously explained that the use of guns and handcuffing during an investigative stop does not necessarily exceed the scope of an investigative detention:

> Other Tenth Circuit cases have upheld the use of guns and handcuffs during a Terry stop in similar circumstances.  See United States v. Gama-Bastidas, 142 F.3d at 1240 (concluding that felony stop was reasonable where informant's tip indicated that one of vehicle's occupants may be armed); United States v. Perdue, 8 F.3d at 1463 (holding that officers where [sic] justified in pointing guns at defendant during Terry stop where officers knew that guns were found on property where marijuana was being cultivated and defendant was stopped on rural road near property); United States v. Merkley, 988 F.2d at 1064 (upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and suspect was pounding interior of truck with his fists)

United States v. Perea, 374 F. Supp. 2d at 976.  Further, the Tenth Circuit has "upheld police officers' use of handcuffs and guns during a Terry stop where they reasonably believe such measures are necessary to ensure officer safety."  United States v. Copening, 506 F.3d 1241, 1248 (10th Cir. 2007)(internal quotation marks omitted).  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause).

The proper analysis is whether Schake's conduct, "in light of all the circumstances, was reasonable."  United States v. Merritt, 695 F.2d 1263, 1274 (10th Cir. 1982).  The question is not

> whether the force used was so great as to render it an arrest but, instead, whether the force used was reasonable.  Whenever the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk

> that anyone will get hurt.  They should not be constrained in their effort to reduce the risk of injury or death simply because the facts known to them create a reasonable suspicion, but do not rise to the level of probable cause.

United States v. Merritt, 695 F.2d at 1274.  In this case, Schake had reasonable suspicion to believe that Pierre-Louis had recently threatened Chavez at gunpoint, and was armed and dangerous.  He was justified in taking precautions to protect himself as he faced a potentially dangerous situation.  Police officers are not "required to take unnecessary risks in performing their duties," and are "authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a Terry stop."  United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002)(internal quotation marks omitted)(citations omitted).  Further,

> "[a]n officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped.  Every traffic stop, after all, is a confrontation.  The motorist must suspend his or her plans and anticipates receiving a fine and perhaps even a jail term.  That expectation becomes even more real when the motorist or a passenger knows there are outstanding arrest warrants or current criminal activity that may be discovered during the course of the stop."

United States v. Albert, 579 F.3d 1188, 1193-94 (10th Cir. 2009)(quoting United States v. Holt, 264 F.3d 1215, 1223 (10th Cir. 2007), overruling on other grounds recognized in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007)).  Thus, the Court concludes that Schake acted reasonably in approaching Pierre-Louis with his gun drawn and in handcuffing Pierre-Louis.

Next, the Court finds that Schake acted reasonably in detaining Pierre-Louis for approximately fifteen minutes.  "[I]n assessing the effect of the length of the detention, [courts] take into account whether the police diligently pursue their investigation."  United States v. Sharpe, 470 U.S. 675, 685 (1985)(first alteration in original).  The Supreme Court has rejected

establishing "a *per se* rule that a 20-minute detention is too long to be justified under the <u>Terry</u>

doctrine," because "[s]uch a result is clearly and fundamentally at odds with our approach in this

area." <u>United States v. Sharpe</u>, 470 U.S.at 686.  Rather, "[i]n assessing whether a detention is

too long in duration to be justified as an investigative stop," the Court must "examine whether

the police diligently pursued a means of investigation that was likely to confirm or dispel their

suspicions quickly, during which time it was necessary to detain the defendant." <u>United States v.</u>

<u>Sharpe</u>, 470 U.S. at 686.

> A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.  A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.  But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable.  The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

<u>United States v. Sharpe</u>, 470 U.S. at 686-87 (internal alterations omitted)(citations

omitted)(internal quotation marks omitted).  Here, Schake detained Pierre-Louis for fifteen

minutes while another police officer found Chavez, and brought him to see Pierre-Louis and

identify whether Pierre-Louis was the alleged assailant.  Fifteen minutes was not an unreasonable

amount of time given that Schake had reasonable suspicion to think that Pierre-Louis could be

the alleged assailant, and another officer had to drive out to find Chavez and bring him to where

Schake was detaining Pierre-Louis.  Schake was doing what he could to act swiftly in

investigating the situation, and the Court is not going to "indulge in unrealistic second-guessing"

and try to think of ways Schake could have detained Pierre-Louis for less time, because it

concludes that Schake acted reasonably in detaining Pierre-Louis for the time needed to bring

Chavez to the scene for Chavez to confirm that Pierre-Louis was not the alleged assailant, which was roughly fifteen minutes.

The final issue is whether Schake acted reasonably in keeping Pierre-Louis in handcuffs for the duration of the detention, after Schake conducted a pat-down search of Pierre-Louis and after he searched Pierre-Louis' vehicle for weapons. The Dash Cam Video and Dash Cam Tr. show that Schake stopped Pierre-Louis at 1:46:15 p.m., handcuffed him at 1:47:32 p.m., and performed the pat-down search at 1:51:57 p.m. See Dash Cam Video at 1:46:15-1:51:57; Dash Cam Tr. at 9:18-20 (Officer). From what the Court can tell, Schake told another person, potentially another officer, at 1:59:07 p.m., that he had not searched Pierre-Louis' vehicle, and the other person told Pierre-Louis at 2:00:38 p.m. that "we're going to look at your vehicle for weapons so we can understand what's going on." Dash Cam Tr. at 15:10-11 (Male Voice). See Dash Cam Video at 1:59:07-2:00:38. Pierre-Louis gave Schake consent to search the vehicle, and Schake searched the vehicle from 2:01:07 to 2:03:31. See Dash Cam Video at 2:00:47-2:03:31. The Dash Cam Video ends at 2:03:36 p.m. See Dash Cam Video at 2:03:36. Although the Court does not know how much longer Pierre-Louis remained in handcuffs, the entire incident took about fifteen minutes, see Complaint ¶ 30, at 4, and so the Court thinks that it was not long after the Dash Cam Video ends before Chavez confirmed that Pierre-Louis was not the assailant, and before Schake released Pierre-Louis from the handcuffs and let him leave. The Court's concern with this timing is how long Pierre-Louis remained in handcuffs after Schake conducted the pat-down search, discovered that Pierre-Louis was not carrying any weapons, and uncuffed him: at least twelve minutes.

"Whether police conduct was reasonably related in scope to the circumstances which justified the inference in the first place is a fact-sensitive inquiry and depends on the totality of circumstances in a given case."   United States v. Salas-Garcia, 689 F.3 1242, 1249 (10th Cir. 2012)(internal quotation marks omitted)(internal citations omitted).   The Tenth Circuit indicated in United States v. Salas-Garcia that, while handcuffing a suspect may initially be justified based on officer safety, the detention may become an arrest if the reason for handcuffing the suspect dissipates:

> Salas-Garcia was only handcuffed for four to ten minutes, and he was subsequently released when the officers discovered that he was not armed and was cooperating with the police investigation.  See [Aplee. Supp. App.] at 151. An investigative detention becomes an unlawful arrest when there is no longer a reasonable basis to keep a suspect in handcuffs.  United States v. Shareef, 100 F.3d 1491, 1508 (10th Cir.1996).  Here, the officers released Salas-Garcia from handcuffs as soon as they learned that he was not a safety risk.  Aplee. Supp. App. at 71.  Under the facts presented here, the officers' brief detention of Salas-Garcia in handcuffs did not become an unlawful arrest.  See, e.g., United States v. Sharpe, 470 U.S. 675, 687-88 . . . (1985)(holding that a twenty minute detention was reasonable and necessary for law enforcement officers to conduct a limited investigation of the suspected criminal activity); Albert, 579 F.3d at 1191, 1195 (holding that placing the defendant in handcuffs for twenty minutes was reasonable and did not elevate the detention into an arrest).

698 F.3d at 1252.  Again, the Court must consider the specific facts of this case and be "guided by the 'touchstone' of reasonableness."   United States v. Salas-Garcia, 698 F.3d at 1248 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)).

Schake was justified in initially handcuffing Pierre-Louis based on the reasonable suspicion that Pierre-Louis may be armed and dangerous.  Once Schake performed the pat-down search, he knew that Pierre-Louis was not carrying any weapons, and his concern for his own safety lessened.  On the other hand, he still did not know whether Pierre-Louis was the alleged assailant and had a weapon in his vehicle.  Had he uncuffed Pierre-Louis, he did not know if

Pierre-Louis would have been able to retrieve a weapon from the vehicle to use against Schake. Schake did not search Pierre-Louis' vehicle until 2:01:07 p.m., and, shortly after he completed searching at 2:03:31, Schake released Pierre-Louis.[25]  The Court does not know why Schake did not think to ask Pierre-Louis earlier to search Pierre-Louis' vehicle; had Schake performed the pat-down search and the vehicle search early in the interaction, Schake likely would have discovered that he was not in danger and could have uncuffed Pierre-Louis while he continued to investigate the situation.  Instead, Schake talked to Pierre-Louis -- a reasonable response.  True, if he had done a protective search of the car earlier, he might have been able to release Pierre-Louis from the handcuffs earlier.  The Court does not think, however, that a police officer must perform his work in the exact order and timing that a federal court, after the excitement dies down, would do it, because the Court recognizes that it has the benefit of viewing the situation from a distance and not with the same stress that a police officer must.

> The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; "common sense and ordinary human experience must govern over rigid criteria."  United States v. Sharpe, 470 U.S. [at] 685 . . . .  Moreover, we should not engage in "unrealistic second-guessing" of a police officer's decision.  Id. at 686 . . . .

United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002).  The Court thinks that Schake acted reasonably when he kept Pierre-Louis in handcuffs until the time that Schake searched Pierre-Louis' vehicle for weapons, because, until that point, Schake still reasonably could have believed

---

[25] The Court bases this statement on the fact that Pierre-Louis contends that "Schake kept Plaintiff handcuffed on the side of I-40 for approximately fifteen (15) minutes before finally releasing him," Complaint ¶ 30, at 4, that the Dash Cam Video shows that Schake handcuffed Pierre-Louis at 1:47:32 p.m., and the video ends at 2:03:36 p.m., which equals about sixteen minutes, see Dash Cam Video at 1:47:32-2:03:36.  While the Court cannot say that the record is clear when he was uncuffed, because the video stops before that event, the Court must construe the facts in Pierre-Louis' favor, taking into account his contentions.

that Pierre-Louis could have access to a weapon; the Court finds that, based on the timeframe that Pierre-Louis asserted in his Complaint, after Schake searched Pierre-Louis' vehicle, it was not long before Chavez said Pierre-Louis was not the assailant and Schake released him.  Under these circumstances, the Court concludes that Schake's conduct was reasonably related to the goals of the stop.

## III.   THE COURT WILL NOT EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE CLAIMS.

The Court will dismiss Pierre-Louis' "Count I: Illegal arrest under the United States Constitution."  Complaint at 3 (title case omitted).  The remaining claims are state law claims, and thus, the Court "may decline to exercise supplemental jurisdiction," because it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  The Tenth Circuit has made clear that it encourages and favors that the district courts decline to exercise jurisdiction on state law claims, particularly at this relatively early stage of the case.  See Armijo v. New Mexico, 2009 WL 3672828, at *4 (noting that the Supreme Court and the Tenth Circuit have encouraged district courts to decline to exercise supplemental jurisdiction when one of the 28 U.S.C. § 1367(c) factors applies).  The Court will decline to exercise supplemental jurisdiction over the remaining state law claims and will remand them to state court.

**IT IS ORDERED** that: (i) the Defendants Joseph Schake and the State of New Mexico's Motion for Summary Judgment Based on Qualified Immunity and Supporting Memorandum of Law, filed October 10, 2012 (Doc. 14), is granted; (ii) the Plaintiff's Cross-Motion for Summary Judgment, filed December 19, 2012 (Doc. 20), is denied; (iii) Count I of the Complaint for Damages, filed May 16, 2012 (Doc. 1 at 5), is dismissed with prejudice; and (iv) this case is remanded to the Second Judicial District Court, County of Bernalillo, State of New Mexico.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Mark Fine
Fine Law Firm
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Phillip W. Cheves
W. Ann Maggiore
Butt, Thornton & Baehr, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendants*